Bobby STOTT, Joseph Register, and Lonnie Michael Cayton, on behalf of themselves and others similarly situated, Plaintiffs,

v.

James G. MARTIN, individually and in his official capacity as Governor of the State of North Carolina, et al., Defendants.

Nos. 85–818–CIV–5, 86–650–CIV–5 and 86–683–CIV–5.

United States District Court,
E.D. North Carolina,
Raleigh Division.

March 31, 1989.

1374

Melinda Lawrence, Donnell Van Noppen, III, Smith, Patterson, Follin, Curtis, James & Harkavy, Raleigh, N.C., for plaintiffs.

Lacy Thornburg, Atty. Gen. of N.C., Raleigh, N.C., for defendants.

Jean A. Benoy, Sr. Deputy Atty. Gen., Dept. of Justice, Raleigh, N.C., for Governor James G. Martin, individually and in his official capacity.

Tiare B. Smiley, Sp. Deputy Atty. Gen., N.C. Dept. of Justice, Raleigh, N.C., for Patric G. Dorsey.

John Burney, Burney & Burney, Wilmington, N.C., for S. Thomas Rhodes.

Clarence Walker, Wayne Huckel, Lisa Hyman, Kennedy, Covington, Lobdell & Hickman, Charlotte, N.C., for James E. Harrington.

G. Eugene Boyce, Wally Young, Womble Carlyle Sandridge & Rice, Raleigh, N.C., for Phillip J. Kirk, Jr.

Edwin M. Speas, Jr., Sp. Deputy Atty. Gen., Education Section, Raleigh, N.C., for Joseph W. Dean.

James Peeler Smith, Sp. Deputy Atty. Gen., Raleigh, N.C., for J. Aaron Johnson.

John R. Wester, David C. Wright, Thomas B. Griffith, Robinson, Bradshaw & Hinson, Charlotte, N.C., for James F. Lofton.

Arch T. Allen, III, Moore & Van Allen, Raleigh, N.C., for James T. Broyhill.

A.L. Sherk and David C. Pishko, Elliot & Pishko, Winston–Salem, N.C., for Grace J. Rohrer.

Robert Byrd, James Ervin, Byrd, Byrd, Ervin, McMahon, Whisnant & Ervin, Morganton, N.C., for Howard H. Haworth.

John S. Stevens, James Williams, Roberts, Stevens & Cogburn, Asheville, N.C., for Helen A. Powers.

John R. Wester, David C. Wright, III, Robinson, Bradshaw & Hinson, Charlotte, N.C., and Isham B. Hudson, Jr., Sr. Deputy Atty. Gen., David Roy Blackwell, Sp. Deputy Atty. Gen., N.C. Dept. of Justice, Raleigh, N.C., for James G. Martin, individually and in his official capacity.

Neill S. Fuleihan, Associate Atty. Gen., N.C. Dept. of Transp., Raleigh, N.C., for

James E. Harrington, individually and in his official capacity.

Bynum Hunter, Mike Gilles, Smith, Helms, Mulliss & Moore, Greensboro, N.C., for David H. Flaherty.

## ORDER

BRITT, Chief Judge.

This matter is before the court on motions by defendants, jointly and individually, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Memoranda and other materials have been submitted by all parties, a hearing has been held, and the matter is ripe for disposition.

## BACKGROUND

This case is a consolidation of three actions brought by employees of the State of North Carolina filed on behalf of themselves and a class composed of other state employees who allege that they were subjected to adverse personnel actions, including terminations, demotions, transfers, coerced resignations, and coerced retirements, in violation of their rights under the First and Fourteenth Amendments of the United States Constitution.

Following the change from the Hunt administration to the Martin administration large numbers of state employees in exempt positions[1] were subjected to adverse personnel actions. The reasons for these personnel changes are in dispute.

Upon Governor Martin's victory in the November 1984 election, a transition team was formed to facilitate the change of administration. This team helped establish personnel policy, assisted in implementing the new governor's agenda, reviewed the efficiency of the nine departments, and assisted the new department heads. The exact nature of the personnel policy established during the transition is disputed.

The transition team was later replaced by a personnel committee and a special department within the Governor's office headed by Ms. Wilma Sherrill. The personnel committee and Ms. Sherrill apparently played a very important role in the large number of personnel changes that took place during 1985 and 1986. There is some dispute regarding whether either the committee or Ms. Sherrill's office exercised a "clearance" power over proposed personnel changes. There are some indications that Governor Martin had the final word over personnel committee recommendations, including terminations. *See* Rann Deposition, p. 62; Carl Deposition, pp. 25–26. However, the exact relationship between the Governor, the personnel committee and Ms. Sherrill, as well as their practices, are disputed.

The defendants concede that there were lists of proposed dismissals which were forwarded to the personnel committee by the various departments. *See* Response to Motion for Class Certification, p. 10. They deny, however, that any employee was fired for purely partisan political reasons other than those for which political affiliation is an appropriate requirement.

The political affiliation and activities including campaign contributions of persons in existing positions, as well as those seeking positions, were apparently well documented. *See* Faircloth Deposition, p. 28; Goodson Deposition, p. 18. The extent to which these documents were used in personnel administration is less than clear.

Defendants, in their joint motion, contend that plaintiffs have not been subjected to unlawful adverse personnel actions and that they are entitled to judgment as a matter of law. They also contend that there is insufficient evidence to support plaintiffs' claim of a conspiracy. The defendants who have been sued in their individual capacities contend that they are protected by the doctrine of qualified immunity. The defendants who have been sued only in their official capacities contend that they should be dismissed as injunctive relief is not available against them.

---

1. North Carolina has a Personnel Act which "protects" employees under its coverage from adverse personnel actions without just cause. N.C.Gen.Stat. § 126–1 *et seq.* Certain positions in state government have been designated as "exempt" from the provisions of the Act. Occupants of those positions, then, have no protection under the Act. All of the class members, by definition, occupied exempt positions.

The defendants, in their individual motions, contend, alternatively, that most of the positions which the plaintiffs and class members held were ones for which political affiliation was an appropriate requirement; that some of the occupants of those positions were discharged for engaging in improper political activity while at work; and, that others were discharged for cause.

The court has thoroughly reviewed all of the job descriptions, depositions, affidavits and other documents which have been submitted. After doing so, it is apparent that a decision in this case will invoke the principles of law set forth in a considerable number of cases of the Supreme Court of the United States and lower federal courts, most of which are canvassed below.

## I. SUMMARY OF APPLICABLE LAW

### ELROD–BRANTI

In *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), a plurality held that the practice of patronage dismissals violates the First and Fourteenth Amendments of the United States Constitution. Justice Brennan noted that "patronage dismissals severely restrict political belief and association ... [and] [t]hough there is a vital need for government efficiency and effectiveness, such dismissals are on balance not the least restrictive means for fostering that end." 427 U.S. at 372, 96 S.Ct. at 2689. *Elrod* did, however, recognize that "[t]here is also a need to insure that policies which the electorate has sanctioned are effectively implemented. That interest can be fully satisfied by limiting patronage dismissals to policymaking positions." *Id.* *Elrod* did not provide any further substantive guidance in assessing these types of claims.

■ *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), filled some of the gaps left by *Elrod*. *Branti* moved away from *Elrod's* "policymaking" label and established the following: "[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. at 1294. As the court has noted in a previous order, the burden is on the defendants to show that political affiliation was necessary or essential to the effective performance of the positions involved. *See Jones v. Dodson*, 727 F.2d 1329, 1334 (4th Cir.1984). Application of the *Elrod–Branti* analysis is a matter of law for the court.

■ In defendants' joint memorandum in support of summary judgment they rely principally on the law of the First Circuit. Following the fall elections in 1984, the commonwealth government of Puerto Rico underwent a change of administration. Substantial personnel changes took place and much litigation ensued. The leading First Circuit case which sets forth a test for determining the propriety of personnel changes based on political affiliation is *Jiminez Fuentes v. Torres Gaztambide*, 807 F.2d 236 (1st Cir.1986). *Jiminez* set forth a two-pronged test for determining whether political affiliation is an appropriate requirement for the effective performance of a position:

(1) Does the particular position relate to partisan political interests or concerns, that is, "does the position involve government decisionmaking on issues where there is room for political disagreement on goals or their implementation? Otherwise stated, do party goals or programs affect the direction, pace, or quality of governance?"

(2) "If the first inquiry is satisfied, the next step is to examine the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that political affiliation is an equally appropriate requirement."

807 F.2d at 241–42.

This court does not accept the First Circuit's test or its application, concludes that it is too broad, not in accordance with the Supreme Court's command in *Branti*, and does not aid the decisional process. Rather, the court feels that *Branti* itself ade-

quately defines the test which must be applied by the court in a position-by-position analysis, taking into consideration *both* the description of the job, if there is one, and such other evidence as is available on the actual duties performed by the occupant.

One of the few uniform points in the decisions is to admit that the determination of whether a position is one for which political affiliation is an appropriate requirement is not an easy one. *Elrod,* 427 U.S. at 367, 96 S.Ct. at 2686; *Branti,* 445 U.S. at 518, 100 S.Ct. at 1294; *Jimenez Fuentes v. Torres Gaztambide,* 807 F.2d at 241 ("[i]dentifying generic categories of positions where partisan selection and rejection are permissible has, as we have seen, proven to be an elusive and intractable task.").

The court begins this task by noting the obvious and important proposition that "if an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining *governmental* effectiveness and efficiency." *Branti,* 445 U.S. at 517, 100 S.Ct. at 1294, *citing Elrod,* 427 U.S. at 366, 96 S.Ct. at 2686 (emphasis added). This proposition requires the court to examine both the nature of the employee's duties and the government's interests.

In *Elrod* the court pointed out that:

The nature of the responsibilities is critical. Employee supervisors, for example, may have many responsibilities, but those responsibilities may have only limited and well-defined objectives. An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position. In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals.

427 U.S. at 367–68, 96 S.Ct. at 2686–87. While under *Branti* the court is no longer limited to labels such as "policymaker,"

*Elrod's* elaboration on the inquiry is still relevant and provides a useful touchstone for the court. *See* p. 1381, *supra.*

Application of the *Branti* principles to some of the positions at issue here brings into consideration the decision of the Fourth Circuit in *Delong v. United States,* 621 F.2d 618 (4th Cir.1980) as it is alleged that there were transfers [2] which amounted to a dismissal.

■ Under *Delong* application of *Branti* principles is limited to dismissals or adverse personnel actions that are the substantial equivalent of a dismissal. The question is "whether ... the challenged reassignment and [or] transfer can reasonably be thought to have imposed so unfair a choice between continued employment and the exercise of protected beliefs and associations as to be tantamount to the choice imposed by threatened dismissal." 621 F.2d at 624. In so holding, the court set forth a rather complicated factual test. *Delong* demands that "both objective and subjective factors pertaining to the officeholder's expectations and reliance upon the continuation of particular assignments and geographical locations in his employment" be considered. *Id.*

[I]t would [also] be appropriate to take into account any special circumstances, including subjective expectations and reliance on the officeholder's part in relation to the particular position held, that were actually or constructively known to the official making or threatening the transfer or reassignment, and that might reasonably be thought to increase the difficulty of the choice imposed upon the employee.

*Id.*

Plaintiffs contend that *any* adverse personnel action is compensable under *Branti.* In *Jones v. Dodson* the court expressly reserved the question of whether the principle can be applied to "other alterations in the employment relationship." 727 F.2d at 1334, n. 5. This court, however, is bound by the *Delong* ruling and must hold the only alteration in the employment relation-

---

**2.** The court uses the term "transfer" to include demotion, re-assignment or reduction in pay- grade as these actions resulted in the employee filling a different position.

ship that is compensable is a firing or a transfer which is the "substantial equivalent of a dismissal." *Delong.*

Summary disposition of *Delong* claims will be rare as the analysis is not simple and may involve disputed facts. In the final analysis resolution of the issue may involve only a question of law for the court or it may involve issues of fact for the jury.

## PICKERING–GIVHAN–CONNICK

*Pickering v. Board of Education, etc.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), found that a teacher's First Amendment rights were violated when he was dismissed for writing a letter to a local newspaper regarding a matter of public concern. In so holding, the court noted that "[t]he problem in any case is to arrive at a balance between the interest of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568, 88 S.Ct. at 1734. In undertaking this balancing test the court examined whether or not a restriction of a particular public employee's freedom of speech was necessary to maintain "discipline by [the employee's] immediate superiors," and whether or not a question was raised as to maintaining "harmony among co-workers." 391 U.S. at 570, 88 S.Ct. at 1735. The court further examined whether criticism by a public employee impeded the employee's "proper performance of his daily duties," or "interfered with the regular operation of the … [office/agency] generally." 391 U.S. at 572–73, 88 S.Ct. at 1736–37. Ultimately, the court held that the teacher's employment relationships with the board were "not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to proper functioning." 391 U.S. at 570, 88 S.Ct. at 1735.

*Givhan v. Western Line Consol. School,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), made clear that the First Amendment affords protection to a public employee who communicates matters of public concern privately, rather than publicly, to his or her employer. *Givhan* also noted

that in determining whether a private expression is protected the court may have to consider other factors not stated in *Pickering.* Specifically, "[w]hen a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered." 439 U.S. at 415, n. 4, 99 S.Ct. at 696 n. 4.

*Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), did not set forth any definitive standard for assessing statements made by public employees. Instead, the court further developed the *Pickering* balancing test and established a multi-tiered, somewhat mathematical approach to safeguarding public employees' speech on matters of public concern. *Connick* reminds us that the threshold inquiry is one of content, that is, is the employee's expression related to any matter of public concern? Moreover, "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." 461 U.S. at 147–48, 103 S.Ct. at 1690–91. This determination is a question of law for the court, 461 U.S. at 148, n. 7, 103 S.Ct. at 1690–91, n. 7.

*Connick* expressly held that "the State's burden in justifying a particular discharge *varies* depending upon the nature of the employee's expression." 461 U.S. at 150, 103 S.Ct. at 1691 (emphasis added). Hence, the content of the employee's expression will be considered twice. First to determine whether it was on a matter of public concern, and then again, to determine the relative degree of public interest, i.e., "a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern." 461 U.S. at 152, 103 S.Ct. at 1692–93.

The following questions or components should be considered before arriving at the most appropriate balancing test: (1) whether the employee's expression impeded his ability to perform his responsibilities; (2) whether close working relation-

ships are essential to fulfilling public responsibilities such that "a wide degree of deference to the employer's judgment" would be appropriate; (3) the manner, time, and place of expression (if the employee's expression takes place at work, then an employer's "fears that the functioning of his office was endangered" may be appropriate); and, (4) whether the context of the expression may be viewed as threatening the authority of the employer to run the office. 461 U.S. at 151–53, 103 S.Ct. at 1692–93.

■ Once these factors have been considered, and the appropriate weights given, they enter the balancing test. Ultimately, resolution

> requires striking the proper constitutional balance between the opposing interests, and this in turn requires weighing the degree of "public concern" legitimately had in the particular expression of ideas—as measured by the expression's content and context—against the degree to which the employee's conduct is justifiably viewed by the public employer as an actual or threatened disruption of the conduct of government operations for which the employer is responsible.

*Jones v. Dodson,* 727 F.2d at 1334; *see also Connick,* 461 U.S. at 152, 103 S.Ct. at 1692–93. The burden of convincing the court that the balance favors the governmental interest is the employer's. *Jones,* 727 F.2d at 1334. Defendants contend that the court must engage in a *Pickering* analysis for most of the class members. However, a review of the materials presented discloses that most often the analysis will be under *Mt. Healthy,* as the reason asserted for the discharge implicates a breach of rules of employment.

## MT. HEALTHY

In *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Court addressed the problem of mixed motive discharges and set forth a "but for" test. "Initially ... the burden [is] properly placed upon [the employee] to show that his conduct was constitutionally protected, and that this conduct was a 'substantial

factor'—or to put it in other words, that it was a 'motivating factor' " in the decision to fire or otherwise impose adverse personnel actions. 429 U.S. at 287, 97 S.Ct. at 576. Once plaintiffs meet this burden, a determination must be made as to whether the defendants "would have reached the same decision ... even in the absence of the protected conduct." *Id.*

> A claim based upon a discharge that is—whether by concession or by proof—a "mixed motive" one of the *Mt. Healthy* type, will ordinarily be resolved simply by *fact finding* that sorts out the motives under the *Mt. Healthy* "but-for" test ...
>
> A critical issue in this type case is therefore likely to be the threshold motivational one: for what reason[s] was the employee discharged? If raised by the evidence, this is *quintessentially* a *factual issue.*

*Jones v. Dodson,* 727 F.2d at 1335–36 (emphasis added).

Applying the principles enunciated in these cases on motions for summary judgment involves the application of Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate where the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

In making this determination the court observes that even though the application of the *Elrod–Branti* (hereafter *Branti*) and *Pickering–Givhan–Connick* (hereafter *Pickering*) tests are ultimately matters of law for the court, disposition by summary judgment will not always be appropriate. In some instances there simply has not been sufficient information presented to the court for it to make a decision. In others, especially those calling for a *Delong* analysis, the facts may be in dispute. Where the duties are clearly defined and the parties are essentially in agreement with regard thereto, summary judgment is appropriate and will be entered. Where the court is unable to make a summary determination, ultimate resolution will require the presentation of evidence.

Application of the *Mt. Healthy* test will rarely result in summary determination because, by its very nature, a mixed-motive discharge will require resolution of factual disputes by the jury.

## II. COMMENT

The fact that we have three branches in our system of government is thought of most often in the context of checks and balances; i.e., by dispersing power among the three branches and by providing checks of one branch over another power is balanced. This avoids the concentration of power in the hands of one, or a few and, thus, the perils of totalitarianism which, after all, is the form of government our forefathers were seeking to avoid when the Constitution was written. However, this does not mean that there may not be any centralization of power in one branch or, indeed, in one person. In order for government to serve the people effectively and efficiently, which *is* its purpose—someone must have sufficient power to *direct* government. More importantly someone must have power to *redirect* government when the people so desire. And, of course, in our constitutional scheme it is the executive which provides that direction. The legislative branch of government, composed of representatives of geographical segments of the population, enacts the laws deemed by them to be in the best interest of society. The judicial branch of government, chosen in such manner as the constitution and laws direct, interprets the law and its application to insure that the constitutional standards are met and legislative intent carried out. But it is the executive branch of government that responds to the will of *all* of the people and proposes laws to the legislature and, once they are enacted, *executes* them. Power then *is* concentrated, to the extent permitted by the constitution, in the executive to *direct* and, when the people desire, *redirect* government. The governor, as the chief executive, and elect-ed by *all* the people,[3] is the most powerful official in state government.

When a governor is elected it is important that he gain control of the machinery of state government to insure that the programs of his administration—those things which caused him to be elected—are carried out. In order to do that he *must* place people in key positions throughout state government who are not only committed to his vision for the state but who are also loyal to him. Former Governor James B. Hunt, Jr., a Democrat and Governor Martin's immediate predecessor, listed by defendants as an expert witness, has testified in this action, by deposition, that there are at least four qualifications those key people must have. They must be *loyal* to the governor, *responsive* to his suggestions, *effective* in carrying out their duties, and *committed* to his program.

Gaining control of state government is no easy task. When Governor Hunt began his second term in 1980 there were some 46,000 to 48,000 people employed by the state. No doubt that number has continued to grow as the population of the state grows and the people demand more services from government.

It is also important for a new governor to gain control of state government quickly if his programs are to be put into effect. This may appear to state the obvious, but it is especially true because of the budgetary process of state government in North Carolina. The governor's programs can be carried out only if the resources—the money—are available. Those resources are provided, of course, by the legislature which meets in North Carolina, in its principal session, in January of odd numbered years.[4] A newly-elected governor is inaugurated in January of odd-numbered years shortly before the legislature convenes. Thus, he has only a short period of time to attempt to place his imprint on a budget which has been prepared, in large measure,

3. The governor is not the only official elected statewide as North Carolina uses the "long ballot" by which the Attorney General, Secretary of State, Commissioner of Agriculture, Commissioner of Labor, Commissioner of Insurance, State Treasurer, State Auditor and Superintendent of Public Instruction are also elected. In addition, appellate and superior court judges are elected statewide.

4. The legislature meets every year but the session in even-numbered years is devoted primarily to adjustments in the budget which is prepared on a biennial basis.

by the administration which is being replaced.[5] Thus, when a governor is elected on the first Tuesday of November he must immediately set about the task of preparing for an orderly transition of the reins of power some sixty days thereafter. As with the national administration in Washington facing the same task on a much larger scale, this is done by the use of a transition team. As one would expect the incoming governor's team[6] is composed of people who helped the governor get elected and who are loyal to him. One of the first tasks facing the new team is to identify those positions in state government where it is necessary for the new governor to place *his people;* i.e., people who meet the criteria outlined by former Governor Hunt. Thus, it is necessary for there to be coordination not only among those who will ultimately form the governor's staff but also among those who will provide leadership in the various departments and agencies of state government. So it is that in forming a new administration the governor, through his transition team, first selects the people who will head the departments and agencies and then, with their input, those who will fill the other critical positions throughout state government.

Once the governor takes office the task of placing his people in key positions has just begun. Since it is the governor to whom the people look to see that their mandate for his administration is carried out, it is not surprising that he maintains direct control over personnel matters throughout state government. This is done, most often, through a member of the governor's immediate staff.

The transition of government as outlined above, or its equivalent, has been taking place in this state and nation since the founding of The Republic. Since at least the days of President Andrew Jackson this transition has been referred to as the "spoils system", a term that, with time, came to have a less than favorable connotation. Even though it is necessary for a new administration to obtain control, the spoils system brought with it the inevitable abuse of power as career government employees were fired, demoted, or transferred to make room for supporters of the new administration. As government grew, and the need for professionalism in government employment became apparent, there arose a demand for protection for civil servants. This led to the enactment of civil service laws.

The North Carolina State Personnel Act (hereafter "the Act" or SPA) is contained in General Statute § 126–1, *et seq.,* and provides that "[n]o permanent employee subject to the State Personnel Act shall be discharged, suspended, or reduced in pay or position, except for just cause." N.C. Gen.Stat. § 126–35. However, the Act exempts certain listed employees and provides a mechanism for the governor to designate as exempt certain other "policy-making" positions. N.C.Gen.Stat. § 126–5. The Act also contains remedial provisions for covered employees who have been aggrieved.

The SPA attempts to balance the need for employee security against the necessity of executive control by the "exemption" mechanism. An employee holding a position that is non-exempt, and this covers some 98% of state employees, is "protected" by the Act and may not be discharged or treated unfavorably, without cause. An exempt employee, on the other hand, is not protected by the Act and may be discharged without cause.

■ When James G. Martin became governor he could have requested the resignation of all exempt employees under his control,[7] some 1,400 to 1,500, without stat-

---

5. In North Carolina the budget is prepared by the Advisory Budget Commission, a hybrid body consisting of fifteen members, four of whom are appointed by the governor, the remainder being appointed by the President of the Senate and the Speaker of the House. N.C.Gen.Stat. § 143–4. However, the figures the Commission uses in preparing the budget must, of necessity, have been obtained primarily from officials in the executive branch.

6. The outgoing governor may also have a team to work with the team of the incoming governor.

7. The SPA also applies to other state employees not under the governor's control, such as those employed by the Commissioner of Insurance, *see* fn. 3.

ing a cause. However, he could not discharge any exempt employee *solely* because of his political affiliation, or because he did not have the endorsement of a supporter of the governor, unless the position held by that employee was one for which political affiliation is an appropriate requirement. *See Elrod, supra; Branti, supra.* Governor Martin, as did his predecessor Governor Hunt, chose not to request the resignation of every state employee in an exempt position, but rather, to make an evaluation of the occupant of each position to see whether that employee fit into his plans for running state government.[8] In the course of making those evaluations the alleged facts giving rise to this lawsuit occurred as the proscribed political considerations came into play even for positions for which political affiliation is not an appropriate requirement.

■ The proscription against firing an exempt employee does not mean that the Governor could not, in making a decision on whether to retain him, consider his party affiliation or whether he supported the Governor's opponent in the last election, so long as the position which the employee held is not entitled to *Branti* protection. Nor does it mean that the Governor could not consider the opinion of his supporters in making his decision. Party affiliation and support of candidates may be indications of the loyalty and commitment the Governor could expect from that employee. Likewise, the *perception* by the public of the Governor's success in carrying out his program is gauged by his supporters throughout the state. Thus, it is natural, and certainly not suspect, for the Governor to seek the opinion of his supporters when filling key positions.

In his dissent in both *Elrod* and *Branti,* Justice Powell forecast the day when federal judges would face the task of deciding whether political affiliation is an appropriate requirement for a particular position in

government, a task he felt should best be left to the legislative and executive branches. That day has arrived. Because of the *manner* in which changes were made in exempt positions when Governor Martin took office, this court must now determine, with regard to the position held by each class member, whether political affiliation was an appropriate requirement for the position.

## III. ANALYSIS OF CLASS MEMBERS BY DEPARTMENT

■ The court will now undertake an analysis of the individual defendants' motions for summary judgment as they relate to different positions and the occupants of those positions.

### A.

### DEPARTMENT OF CORRECTION

#### *Defendant Aaron J. Johnson*

Defendant Aaron J. Johnson (Johnson)[9] is Secretary of the Department of Correction. North Carolina General Statute § 143B–261 provides:

> It shall be the duty of the Department to provide the necessary custody, supervision, and treatment to control and rehabilitate criminal offenders and juvenile delinquents and thereby to reduce the rate and costs of crime and delinquency.

This department, containing both the Division of Prisons and the Division of Adult Probation/Parole, has nineteen class members remaining. One class member was employed in the Division of Adult Probation/Parole, another in the Secretary's office, and all others in the Division of Prisons.

#### *Gordon Sauls*

Class member Sauls is a former Branch Manager in the Division of Adult Probation and Parole who retired in 1985.

---

**8.** The court would observe that the predicament the Governor now faces in defending this lawsuit was somewhat self-inflicted. Like his predecessor the Governor, in his campaign for the office, attacked the practice of previous administrations in discharging state employees for "political reasons", an obvious effort to win the sizeable state-employee vote. Since non-exempt

employees could not be fired without cause in any event, that effort was, necessarily, directed at the 1,500 exempt employees.

**9.** Throughout this order each plaintiff, defendant, and class member will be referred to by his or her surname.

Johnson argues that Sauls' position as a branch manager was one for which political affiliation is an appropriate requirement. He contends that Sauls' position as a branch manager is comparable to that of an area administrator in the Division of Adult Probation and Parole. Sauls, as branch manager, oversaw approximately 55–60 people in a nine-county area. His responsibilities included

see[ing] that all Adult Probation/Parole work in the 9–county branch was done each day, that [all] courts were covered by officers, [that] new clients [were] properly received, classified and assigned for supervision ... [that] all caseloads [were] managed and supervised, [and] all violators returned to court and the Parole Commission.

Sauls Response to Defendants' Joint Interrogatories No. 11.

■■■■ Johnson offers evidence of both the actual duties performed by Sauls and the job description for a "probation/parole branch manager." [10] The job description includes planning, organizing and directing, and budgetary [11] duties. Sauls was also responsible for setting work standards and reviewing the work of his staff. In addition to plaintiffs' blanket response that none of the class members held positions for which political affiliation is an appropriate requirement, they rely on defendant Martin's interrogatory answers which state that political affiliation was not a necessary requirement for the performance of any class member. Such a response provides little guidance to the court, and the interrogatory answer is not binding as to any of the other defendants. The court, nevertheless, concludes that while Sauls' position involved substantial responsibilities, ultimately, it required the exercise of *profes-*

*sional* skill and judgment, and not political affiliation with the executive.

Johnson also contends that Sauls "elected" to retire after being demoted for cause (poor performance). Plaintiffs deny the allegations of poor performance and contend that since the retirement was after the demotion and was not voluntary, it was a constructive discharge. The facts being in dispute, summary disposition is inappropriate. A *Delong* inquiry remains.

### John Taylor

■■■■ Class member Taylor was employed as a former District Manager in the Division of Prisons until he was transferred to the Cameron Morrison Youth Center. The district manager is apparently the chief assistant to the area administrator. This position entails supervising the administration of prisons within a district.

Plaintiffs contend that the district manager position is a fifth level position within the Division of Prisons and a seventh level position within the department as a whole and that occupants of the position "make no policy and have little, if any, input into the policy articulated in the Department Policy and Procedures Manual."

Johnson has submitted an extensive job description which reveals a position that is obviously important to the maintenance of an efficient and effective prison system. Among the duties listed are the following:

Management and coordination of ... expenditures within the designated field command. Continual review of operational costs and request [sic] for expenditures, requisitions and job orders.... Preparation and monitoring of budgetary

---

**10.** Defendants urge the court to adopt the First Circuit's approach to examining the particular responsibilities of a position. Under the First Circuit's command the "court's focus [is] on the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office." *Jimenez Fuentes,* 807 F.2d at 242. "The relevant inquiry is to the function of the public office in question and not the actual past duties of the particular employee involved." *Id. quoting Brown v. Trench,* 787 F.2d 167, 168 (3d Cir.1986). The court is not inclined to adopt such a rigid approach. An

approach that completely ignores the actual duties performed within a given position by this particular employee and other employees is suspect and subject to abuse. Accordingly, the court will conduct the *Branti* inquiry by considering both the actual duties performed and the job descriptions.

**11.** These budgetary duties apparently only included making requests and expending appropriated sums. No discretion in allocation of resources was given.

requests for presentation to the Area Administrator.

. . . .

Development and implementation of management tools to evaluate existing programs and provide a basis for planning new programs. . . .

Public Relations: Assist the Area Admin[istrator] in the development of publications to insure the availability of accurate and timely information regarding the State Corr[ection] Service. Presentation of programs to various outside organizations and representation of the Prisons Board or panel member at functions relating to the Correctional field.

Several of the duties above outlined involve "policymaking" matters making political affiliation "an appropriate requirement for the effective performance of the ... office." *Branti*, 445 U.S. at 518, 100 S.Ct. at 1294. Duties and responsibilities for the allocation of resources, and planning of budget requests are the essence of policymaking in government.

Likewise, the evaluation of programs, the planning of new programs and public relations are areas where those in power can reasonably expect to have their "own people." The internal operation of a state prison system is not a "political" matter; the public perception of how that prison system is operated is a "political" matter. Every election on the state level has issues raised involving the prison system. Candidates for governor must advance their positions on the size and location of facilities, the period and extent of programs, and, most importantly, the allocation of resources. When a governor is elected he is entitled to have his people in sensitive, policymaking positions to assist him in carrying out the mandate he received by being elected. The court holds that this is such a position and one for which political affiliation is a proper requirement.

### Robert Forester

■ Class member Forester was employed as a Corrections Superintendent III in Asheville, North Carolina, until he was dismissed in May 1985. As such he was responsible for the total operation of the Craggy Prison located in Asheville. Defen-

dants contend that this is a position for which political affiliation is an appropriate requirement. However, defendant Johnson offers conclusory statements, such as, "[t]he job specifics for this position shows [sic] that it was policymaking," rather than a logical argument which would support the conclusion that the head administrator of a prison is a position for which political affiliation is an appropriate requirement.

Plaintiffs, likewise, provide the court with little guidance. They rely chiefly on Deputy Secretary Harvey's concession that "superintendents are probably called upon simply to follow rather specific instructions." Plaintiffs have pointed out that prison superintendents are far down the chain of command in the Division of Prisons. Forester contends that he had no authority to hire or fire employees without the approval of someone further up the chain of command. The job description offered by defendant Johnson does not rebut this. Furthermore, the job description does not indicate a policymaking role or similar duties for a prison superintendent.

Unlike the District Manager (Taylor) above, who helps formulate budget and policy, the correctional superintendent is responsible for the internal, day-to-day management of the prison, under the guidelines and within the budget developed by others. Throughout the job description there are references to the fact that "major changes" are made or approved by others.

The court concludes that Forester's duties, while broad in scope, are clearly defined and require the exercise of professional judgment and skill, and do not require a particular political affiliation.

Johnson also contends that Forester was dismissed for cause, that is, "for improper use of State vehicle, misuse of State funds, negligence, and accepting gifts from inmates." In his interrogatory response No. 1, Forester has denied these allegations. Accordingly, summary judgment is not appropriate on this ground.

### Vance Gabriel

■ Class member Gabriel was an Accounting Manager III in the Division of

Prisons. Defendants contend that this is a position for which political affiliation is an appropriate requirement. A review of the job description reveals that this position is an administrative job in the purest sense. The duties are complex and important; however, they are technical, specific, and non-discretionary. This is *not* a position for which political affiliation is an appropriate requirement.

Johnson also contends that Gabriel was dismissed for cause, that is, "for engaging in political activities on state time and property." Gabriel has, by affidavit, denied these allegations. Accordingly, genuine issues of fact remain to be resolved. Summary judgment on this ground is inappropriate.

### Marcus Hughes

■■■ Class member Hughes was employed as an Assistant Correctional Superintendent for Custody and Operations I until he was demoted in October 1985. According to Johnson, he was the superintendent's righthand man. Since the court has concluded that the correctional superintendent is not a position for which political affiliation is an appropriate requirement, it is logical that this position, likewise, is one which falls under the protection of *Branti*. A review of the job description confirms this, revealing a position that implements well-defined policy.

Johnson also contends that Hughes was demoted "for cause for negligence and failure to maintain a satisfactory and harmonious working relationship." Johnson has failed to provide evidentiary support for this allegation and Hughes denies this was the reason for the demotion. Since there are disputed issues of material fact, summary judgment is not appropriate on this ground. A *Delong* inquiry also remains.

### Thomas Ivester

■■■ Class member Ivester was employed as the Administrator of the Cameron Morrison Youth Center (at that time Correctional Administrator I) until he was demoted. According to Ivester, his duties as head of the youth center "included a great deal of administration, treatment, and security responsibility." The job description submitted by the defendants supports this and does not particularly support defendants' assertion that this was a position outside of *Branti* protection.

A person in this position does work independently, but there is no significant evidence that Ivester's position entailed policy judgments such that his political affiliation could influence or interfere with the discharge of his duties. Although the job description refers to evaluation and recommendation of "new concepts" and evaluation of budget needs, it is clear that decisions in these areas are reserved for others. The court concludes that this position is one for which political affiliation is not an appropriate requirement.

Johnson also contends that Ivester was demoted because of problems with his relationship with the local community and prison security. Ivester contends there is no evidence to support this and has provided evidentiary materials which place in serious doubt the actual reasons for the demotion. As such summary judgment on this ground is not appropriate. A *Delong* inquiry also remains to be resolved.

### Bill Noland

■■■ Class member Noland was, according to Johnson, "Special Assistant to the Secretary for the Administration of the Fugitive/Extradition Program." He was a member of the Secretary's staff and answered to the Assistant Secretary for Programs and Development. Noland has also referred to his position as "Corrections Special Services Manager." [12] According to Noland, his position entailed the supervision of daily operations of the extradition section. Johnson, highlighting the various budget duties and the fact that Noland supervised investigations, argues that this is a "sensitive and confidential position." Those duties, however, appear to be non-

---

**12.** Contrary to plaintiff's memorandum, he was in the position referred to by the defendant as he signed the job evaluation description.

discretionary and require Noland to follow established guidelines. Noland argues that his job entailed administrative, technical, nonpolicymaking duties. After review of the job description material, and Noland's interrogatory responses, the court concludes that this is not a position for which political affiliation is an appropriate requirement.

### Charles Hawley

■ Class member Hawley was employed as a Correctional Superintendent I for a minimum custody facility. Hawley's position involved managing the operation of a prison field unit, in his case a minimum custody facility, which includes custody, programs, food service and maintenance. This position is no longer classified as "exempt" under the North Carolina Personnel Act.[13] Nevertheless, Johnson maintains that the position is one which relates to "partisan political interests ... [or] concerns." Johnson offers the following: "Whether prisons should be places where inmates are to be coddled or provided with only minimal services or are to be punished or rehabilitated are likely to be significant political issues." This comment states the obvious and misses the point. The inquiry does not depend so much on the political interest of Hawley's profession as it does on his role within it, that is, whether Hawley occupied a position for which it could be said that his private political beliefs would interfere with the effective discharge of his duties. The extent to which independent judgment is a part of his job, and the nature and extent of discretion he may exercise are the relevant considerations. Hawley is a manager who had specific additional responsibilities because he was dealing with an inmate population. He was, nevertheless, simply an administrator and a manager. He was neither a policymaker nor a key player in the policy administration of corrections in the State of North Carolina. He occupied a position which demands professional judgment and skills, not political affiliation with the executive.

### Correctional Superintendents II: Perry Hilliard, Bruce Marion, Ralph Stamey, and Phillip Styles

■ Class members Hilliard, Marion, Stamey and Styles were all Correctional Superintendents II in the Division of Prisons. This position entails overseeing the operation of a prison field unit within a larger prison institution. The responsibilities of the position include all those traditionally associated with any manager of a service facility with the added custody and security responsibilities attendant to a correctional institution. The job description presents a picture of a relatively independent position; however, any major changes are reviewed and approved by the prison administration. Additionally, these superintendents do not have final authority with respect to disciplinary actions against inmates or employees.[14]

Upon consideration of the job descriptions and all other materials submitted, the court concludes that the duties involved in these positions are clearly defined, and involve the exercise of professional judgment and skills. Political affiliation is not an appropriate requirement for these positions.

Johnson also contends that Hilliard was allowed to retire in lieu of being dismissed for poor performance. Plaintiffs contend that there is no evidence to support the claim of poor performance. Johnson has failed to provide sufficient evidence to support this argument, and the court is persuaded that genuine issues of material fact remain to be resolved. Summary judgment on this ground is not appropriate.

### Patricia McQuillan

Between 1 November 1984 and 5 January 1985 class member McQuillan was serving as a Public Information Officer. In March 1985 she was transferred and promoted to "Special Assistant for Accreditation." Both of these positions were classified as "exempt" under the North Carolina Per-

---

**13.** On 1 May 1985 the Martin administration removed all Correctional Superintendents I and II from the "exempt" list.

**14.** The court further notes that these positions are no longer classified as "exempt" under the North Carolina Personnel Act. *See* fn. 13.

sonnel Act. In 1987 McQuillan's position as special assistant was abolished by the General Assembly.[15]

 McQuillan's position as a public information officer involved participation in public forums and public speaking engagements. Without further elaboration, the court notes that that position was one for which political affiliation was an appropriate requirement. *See Branti*, 445 U.S. at 518, 100 S.Ct. at 1294. Accordingly, defendant Johnson was free to have McQuillan removed from that position. Further, McQuillan's move from that position was a promotion which cannot be characterized as an "adverse personnel action."

 McQuillan now contends that the abolition of her second position as a special assistant for accreditation was an "adverse personnel action" properly within the scope of the class defined by the court. The court disagrees. McQuillan contends that shortly before her position was abolished she was asked about her support of a Democratic candidate for governor. She further alleges that she was advised that her position was going to be abolished by defendant Johnson regardless of what the General Assembly did. Such an allegation does not state a claim within the scope of this class action. The court is concerned with what did happen, not what could have, or would have happened. The abolition of McQuillan's position by the General Assembly is not an adverse action within the meaning of this lawsuit.

### Thomas S. Ryon, Jr.

 Class member Ryon was employed as the Deputy Secretary of Correction. Johnson points out that Ryon, as the deputy secretary, was the "stand-in" and chief assistant to the secretary, and contends that this was a policymaking position with significant responsibilities. The deputy secretary assumes the responsibilities of the chief budget officer and, according to the defendants, it is the responsibility of the deputy secretary to present the depart-

ment's budget to the legislature. The job description for the position provides:

> Under the Secretary, this is high-level administrative and management work in developing and implementing the programs of the Department of Correction. Employee represents the Secretary in all departmental matters in his absence, and handles significant special assignments as delegated. Work involves responsibility for planning and coordinating the property management, contractual services, fiscal, organization, and procurement matters between the chief business management and administrative officials of the Division of Prisons, Adult Probation/Parole, and the Parole Commission. Policy formulation, long range planning, organizational review, and improvement and determination of budgetary needs are prime responsibilities of this position.

Plaintiffs continue to rely on the argument that no class member held a position for which political affiliation is an appropriate requirement. They also rely extensively on Ryon's discussion of what he actually did while holding that position, that is, primarily financial responsibilities, including preparing a budget. *See* Ryon Deposition, pp. 13–14. Ryon contends that he was not involved in the "policy planning end of things," and that he was not "specifically charged with insuring that the Governor's programs were carried out within the divisions, within the Department of Corrections." Ryon Deposition, pp. 25–26.

Upon consideration of the materials submitted, case law, and common sense, the court concludes that the position of Deputy Secretary of Correction is one for which political affiliation *is* an appropriate requirement and, therefore, Ryon is not entitled to *Branti* protection.

### Area Administrators: Robert Barbour, Talmadge Barnett, Raymond Jarvis, David Luther, and Harvey Yow

 Class members Barbour, Barnett, Jarvis, Luther and Yow were all area ad-

---

**15.** Defendants' assertion that there is a cutoff period for adverse actions is not entirely correct. The only cutoff date for adverse actions for those who otherwise meet the class defini-

tion is the end of the opt-out period as set forth in the notices sent out for potential class members in December of 1987.

ministrators for the Division of Prisons. There are six area administrators for the State of North Carolina. Three area administrators serve under the eastern geographic command manager and three serve under the western manager. These managers report to the assistant or deputy director who in turn reports to the director of the Division of Prisons. Thus, area administrators are at the fourth level of authority within the Division of Prisons, and the sixth level of authority within the Department of Correction as a whole. Johnson has submitted job descriptions for these positions and his interpretation of their duties and responsibilities.

The job description for a Correctional Administrator I (area administrator) begins by stating that:

Employees in this class administer and coordinate the overall correctional operations for a large geographic area of the State or for a complex. Employees provide supervision for ten to twelve field units and, in some cases, a backup institution or for a complex composed of several institutions or facilities. *Employees participate in the development of Division policy* and disseminate this to the field units or institutions.... (emphasis added.)

These positions obviously have substantial responsibility and involve not only a wealth of administrative tasks, but also the considerable exercise of independent judgment. While the job description does state that "major changes in organizational structure, programs, or procedures are approved by prison administration" the job description is explicit in stating the role of these positions in policymaking. For example, it states that "[l]ong-range planning is made by prison administration *with significant input from employees in this class.*" (emphasis added). The materials submitted by the plaintiffs do not sufficiently rebut the accuracy of this job description. Yow testified during his deposition that the job description accurately describes the duties and responsibilities of an area administrator. He testified that *in his opinion* "the part over policy [sic] development is overemphasized in this job description," that in his actual personal experience he

did not actually participate *that much* in the development of policy that affected the Department of Correction or the Division of Prisons throughout the state. Generally that policy was developed at the Raleigh level, and, *of course, I was given the opportunity to review the policy and make recommendations before most of them were finally disseminated to the field.* (emphasis added).

Yow further testified that he did not, as an area administrator, vote on the adoption of a policy, even though he did have "input and an opportunity to comment on policy." Yow Deposition, pp. 10–11.

Yow also testified that it was an area administrator's responsibility to explain new policies to superintendents and other subordinates in the area office, and to see that policies were carried out. Yow Deposition, pp. 11–12.

Barbour's affidavit states that "[a]rea administrators sometimes have input into these policies, but decisions as to final policies are made in the Secretary's and the Director's office." Barbour Affidavit, p. 2. Barbour also contends that "Departmental policies are set out in a great deal of detail in the Policies and Procedures Manual[, and] there is limited discretion in [the] application of these policies and procedures." Affidavit, p. 3.

Johnson characterizes area administrators as "chief policymaking positions in the Division of Prisons," and as a key link between the Secretary of Correction and the Division of Prisons. Plaintiffs, on the other hand, characterize these positions as "field operations personnel who are in no way a chief link between the Raleigh headquarters of the Department of Corrections and the Raleigh headquarters of the Division of Prisons."

All five area administrators were career employees with between eighteen and twenty-eight years of service with the department. Regrettable as their separation from state employment may be, this is not the appropriate forum for reviewing the judgment, or lack thereof, exercised by a new administration. These positions involve input into policymaking, and these

class members exercised considerable control over departmental policies in the way that they interpreted and disseminated information with respect to these policies and insured that they were carried out.

The court concludes that these are positions for which political affiliation is an appropriate requirement.

To summarize, the court concludes that as to the positions held by class members Barbour, Barnett, Jarvis, Luther, Ryon, Taylor, and Yow political affiliation was an appropriate requirement and Johnson's motion for summary judgment against those class members will be allowed. Class member McQuillan is not properly within this class, and the motion for summary judgment as to her will be allowed. As to the positions held by class members Forester, Gabriel, Hawley, Hilliard, Hughes, Ivester, Marion, Noland, Sauls, Stamey and Styles, political affiliation was not an appropriate requirement and summary judgment will be entered so holding. An issue of fact remains with regard to the discharge of class members Forester, Gabriel, Hilliard, Hughes, and Ivester.

### B.

### DEPARTMENT OF HUMAN RESOURCES

*Phillip J. Kirk and David T. Flaherty*

According to N.C.Gen.Stat. § 143B–137 the duties of the Department of Human Resources are as follows:

> ... to provide the necessary management, development of policy, and establishment and enforcement of standards for the provision of services in the fields of general and mental health and rehabilitation with the basic goal being to assist all citizens....

Defendant Phillip J. Kirk is the former Secretary of the department. He served from January 1985 to February 1987 at which time defendant David T. Flaherty assumed the position. This is the largest department in North Carolina state government, and there are twenty-one remaining class members who were or are employed there.

### *Betty R. Albright*

■ Class member Albright was employed as Director of the Juvenile Evaluation Center until she was dismissed in April 1985. Defendants contend that Albright occupied a position for which political affiliation is an appropriate requirement. Kirk has submitted his own affidavit and a job description for the position. The court notes that this job description was prepared when Donald Pagett, also a class member in this action, occupied the position and was approved by him. The defendants have not submitted a job description approved by Albright, and plaintiffs challenge the complete accuracy of the description submitted. They contend that "the job description was 'inflated' in over-emphasizing the responsibilities of the position because it had been prepared for the purpose of obtaining and [sic] increase in salary grade for Mr. Pagett." With this in mind, the court will now consider the materials submitted and the various accounts of the responsibilities of the Director of the Juvenile Evaluation Center.

In her capacity as Director of the Center Albright had traditional management and administrative responsibilities. She also had the additional security and rehabilitation concerns attendant to such an institution. The court has already concluded that these duties and responsibilities, in and of themselves, are not of a character that would make political affiliation an appropriate requirement for the effective performance of the position. *See* Discussion of class members Forester, Ivester, Hawley, Hilliard, *supra*.

*However,* Albright also served as a member of the Divisional Management Team which "is responsible for *recommending,* reviewing and *implementing* policies and procedures to guide the *entire Division.*" Kirk–Albright Affidavit, p. 2. (emphasis added). The court concludes that this added responsibility transformed Albright's position into one for which political affiliation is an appropriate requirement. Since Albright had input into division-wide policy, the defendants could legitimately question her commitment to the new administra-

tion's agenda with respect to policies concerning the Division for Youth Services.

### William R. Atkinson

██ Class member Atkinson was employed as Assistant Deputy Director for Institutional Services, Division for Youth Services. Defendants contend that Atkinson occupied a position for which political affiliation is an appropriate requirement. The court has reviewed the job description, Kirk's affidavit, and Atkinson's affidavit. The job description explicitly states that the "primary responsibility of this position is providing executive management and leadership to this division of State Government. This position provides management and leadership functions by *making policy decisions....*" (emphasis added.) Additionally, Atkinson has conceded that he was "responsible for *implementing* the Division programs," and that he provided information and *recommendations* or *advice* to the Division Director and Secretary *on policy matters.* Atkinson Affidavit, pp. 1–2.

*Elrod v. Burns* approved "consideration ... [by the public employer as] to whether the employee acts as an adviser or formulates plans for the implementation of broad goals." 427 U.S. at 368, 96 S.Ct. at 2687. *Branti* did not abandon this inquiry. 445 U.S. at 511, 100 S.Ct. at 1291.

The court concludes that Atkinson, as Assistant Deputy Director for Institutional Services, Division for Youth Services, occupied a position for which political affiliation is an appropriate requirement.

### Allison Barham

Class member Barham was employed as a Business Officer III in the Division for Youth Services. Defendants argue that his position is one for which political affiliation is an appropriate requirement. They rely on Kirk's affidavit, and a job description. The most pertinent provision of the description is that "this position has the overall responsibility for the control, expenditure and accountability for approximately $15 million annually." [16] Neither the defendants nor the plaintiffs have provided the court with any significant guidance in how

such considerable fiscal responsibility should be reviewed under *Branti.* Defendants argue that "[t]he allocation of finite resources, decisions as to which programs to fund at various levels, and decisions as to legislative strategies all involve 'decisionmaking on issues where there is room for political disagreement on goals or their implementation.'" (Citation omitted.) This argument might be persuasive *if* it were supported by evidence. It is not.

The job description does provide that the Chief Fiscal Officer "[s]upervise[s] and assist[s] in the preparation and presentation of the biennium budget ... [and] [p]repare[s] budget information and assist[s] in the presentation to [the] General Assembly...." A review of the deposition testimony of Barham and other documents submitted by plaintiffs leaves the impression that the chief fiscal officer's duties are largely technical, and are guided by various state budget manuals and federal and state legislation.

Defendants also contend that "the budgetary process itself is largely comprised of confidential information relating to the current administration's spending priorities and various confidential proposals of how to satisfy those priorities with limited funds." This assertion could also be persuasive *if* it were supported by evidence. It is NOT. In fact, the only evidence the court has received on this subject is Barham's testimony that all the material handled in the budget process was public information. Barham Deposition, p. 71.

It is quite evident that critical facts are still disputed, making summary judgment on this issue inappropriate.

Kirk also contends that Barham was discharged because a "new management style was needed." According to Kirk his "decision to remove Mr. Barham was based on his weak management skills and [his] belief that the Division of Youth Services needed a management style different from that of Mr. Barham." The affidavit does not further detail what Kirk meant by "weak management skills." Kirk–Barham Affidavit, p. 3. In any event, plaintiffs have

**16.** As of 1985 the budget was up to $38 million.

submitted materials which offer a markedly different view. Summary judgment on this ground is, likewise, inappropriate.

### Logan Burke

Class member Burke was employed as a Special Assistant in Institutional Services, Division of Youth Services. There is no contention that this position is one for which political affiliation is an appropriate requirement. Kirk does contend, however, that Burke's position was abolished because Kirk concluded that the position was not needed. Burke was removed

> as the result of an administrative reorganization in which his job was abolished. The position had been created for Mr. Burke in Winston–Salem so that he could live with his wife. I determined that the Department could not justify having a specially created branch office in Winston–Salem when it did not have such offices in other cities. Moreover, the services Mr. Burke had been performing were not necessary to the success of the Division.

Kirk–Burke Affidavit, pp. 1–2. Kirk has provided no other evidentiary support for this "administrative reorganization."

Plaintiffs contend that the position has not really been abolished. They contend that first Burke was fired and *then* the position was "reallocated to Administrative Assistant for Volunteer Services." That position was then removed from the "exempt" list, and a replacement was hired in October 1985. In July 1986 the position was redesignated as Volunteer Services Director II. Most telling is that the materials documenting these changes list the "employee replaced" as Burke. The court concludes that plaintiffs have shown a genuine issue of material fact regarding the actual reasons for the removal of class member Burke, making summary judgment inappropriate.

### Lonnie Michael Cayton

■ Plaintiff Cayton was employed as Director of the C.A. Dillon School, a residential treatment and rehabilitation center for juvenile delinquents. Defendants argue that Cayton occupied a position for which political affiliation is an appropriate requirement. First and foremost, Cayton managed the Dillon facility. Additionally, however, he "serve[d] as a member of the divisional management team and [was] responsible for *recommending, reviewing, and implementing policies and procedures to guide the entire division.*" Included in plaintiffs' supporting materials is a letter to Cayton from class member Atkinson. That letter states "I would like to express to you my appreciation for your participation on the Policy Review Committee for the Division of Youth Services. You are to be commended for the *excellent policy recommendations ...."*

Plaintiffs urge the court to consider the fact that Cayton operated within the constraints of state and federal law, and other established procedures and guidelines. That may be true, but it does not address Cayton's additional role in policy formulation for the Division of Youth Services which may guide or complement state and federal law.

The court is most persuaded by the evidence which admits Cayton's policy implementing role, and his opportunity to comment, make recommendations, or otherwise have input into policy formulation divisionwide. The court does not discount the overriding importance of this position as one which demands *professional* skills; nevertheless, Cayton's admitted input into policymaking beyond his institution is determinative.

The court concludes that plaintiff Cayton occupied a position for which political affiliation is an appropriate requirement.

### Gayle Christian

■ Class member Christian was employed as an Administrative Secretary V in the Division of Aging but was "reallocated to Secretary IV" in April 1986. She resigned in December 1986. Kirk argues that the position of Administrative Secretary V is one for which political affiliation is an appropriate requirement.

Defendants have submitted an affidavit of Ms. Christian's immediate supervisor, and a job description whose accuracy was attested to by Ms. Christian. According to

both, Ms. Christian's position as an Administrative Secretary V involved handling confidential communications. Stoops' Affidavit, p. 2; job description II.A., III.F. The job description specifically provides that Christian:

> Preform [sic] clerical duties[,] ... [m]aintain appointment schedules for the Assistant Secretary and Deputy Director, *handle confidential communications with Administration,* ... attend to routine administrative office responsibilities

II.A. (emphasis added). The description further provides:

> Describe the part(s) of the work which requires care to safeguard other persons. [Response] Other than confidentiality in specific matters, ...

Plaintiffs' response is unpersuasive. Plaintiffs argue that since Governor Martin has testified that even the position of confidential secretary to the Governor does not require a certain political affiliation, then this position, likewise, does not require political affiliation. The court has already held that Governor Martin's testimony and interrogatory answers are not binding or dispositive. Moreover, the court is persuaded that by virtue of Christian's access to confidential information, and involvement in confidential communications, she occupied a position for which political affiliation is an appropriate requirement.

### Otis M. Congleton

 Class member Congleton was employed as the Deputy Director of the Division of Aging. Defendants argue that this position is one for which political affiliation is an appropriate requirement. They argue that Congleton had a substantial policymaking role in a politically charged area; that he prepared materials for use in developing legislation; and, acted as a spokesperson for the division. The job description provides, in part, that Congleton:

> [P]erform[ed] the functions of the Assistant Secretary during his absence ... ha[d] primary responsibility for program direction, [and] policymaking....
> [C]onduct[ed] sessions with the three Section Chiefs to *gain input into proposed policies* ....

> [P]repare[d] specific materials for use in developing legislation, either for the Department of Human Resources or for the Legislative Study Commission on Aging.

(emphasis added.) Congleton has further admitted that he "was registered to work with Legislators on Aging issues.... In essence [that he] was involved in almost every aspect of the operations of the Division [sic] of Aging." Interrogatory response No. 11.

Plaintiffs argue that "the policies, procedures and programs for this division are established by federal and state statutes, with further policy decisions being made by the Secretary of the Department of Human Resources, upon the advice and recommendation of the Council on Aging." Plaintiffs, however, concede that "[i]ndividuals employed in the division of Aging are responsible for *implementing* and administering these policies and procedures." Furthermore, Congleton's affidavit states that his "role in the Division was to ensure that the policies and procedures which had been established were carried out and complied with. [His] role in policymaking within the Division was limited to *making recommendations* and *advising the Secretary,* the Council and the Director." Congleton Affidavit, pp. 1–2 (emphasis added). Congleton's role in preparing materials for use in legislation is also a significant consideration in determining the appropriateness of political loyalty and affiliation.

Admittedly, much of the policy that governed and directed the Division of Aging is established by federal and state statute, and most additional policymaking decisions are made outside the Division of Aging. These facts do not, however, end the *Branti* inquiry. Congleton has conceded that he had input into some policy decisions through recommendations and advice to the Secretary. By his own admission he was also a lead actor, that is, he had a primary role, in the implementation of these policies. *See Elrod v. Burns,* 427 U.S. at 368, 96 S.Ct. at 2687.

The court is persuaded that Congleton occupied a position for which political affil-

iation is an appropriate requirement for effective performance.

### Ron Davis

■ Class member Davis was employed as Chief of the Program Services Section, Division of Aging. Defendants contend that Davis did not occupy a position entitled to *Branti* protection and that Davis had "meaningful input into government decisionmaking" since he served as "the principal adviser to the Deputy Director and Assistant Secretary of Aging on the Older Americans Act," 42 U.S.C. §§ 3001 *et seq.*, and other programs developed by the Administration of Aging. Plaintiffs argue that Davis' job was strictly guided by federal and state statutes and policies contained therein or established elsewhere.

Defendants make a good point regarding the significance of such statutory guidance; that is, "general statutory guidelines and 'policies' do not by any means accomplish all the policymaking that occurs in the Department of Human Resources." A review of the Older Americans Act reveals a significant statutory structure. It also reveals a scheme that allows states ample discretion in the manner of implementation. It also encourages complementary state policy formulation and implementation. The job description provides that the occupant of this office would "[p]articipate[ ] in the development of program management policy for Title III and Title V of the Older Americans Act of 1965 as Amended." It further provides that "[w]hen major issues arise around [sic] interpretations and policy decisions, these are discussed with or referred to the Deputy Director and/or Assistant Secretary."

These provisions could be interpreted quite broadly; however, the court is persuaded that Davis' responsibilities were essentially administrative, technical and professional. His extensive involvement in the implementation of the Older Americans Act involved reviewing plans submitted by local agencies for funding to ensure their compliance with the Act and other *established* statutory and regulatory provisions. A review of the job descriptions submitted by plaintiffs and defendants further leads the court to the conclusion that Davis' role as a "principal adviser" was that of a technical adviser, not a policy adviser.

Davis did not occupy a position for which political affiliation is an appropriate requirement.

Alternatively, Kirk contends that Davis was discharged for poor job performance. In response, plaintiffs have submitted positive performance evaluations. Additionally, Davis alleges that he was specifically informed that the discharge had nothing to do with the quality of his work. *See* Interrogatory Response No. 2. Accordingly, summary judgment on this ground is not appropriate.

### Charles Cook

■ Class member Cook was Chief of the Adult Health Section of the Division of Health Services until he was discharged by Kirk on 1 March 1985 allegedly for poor job performance. Initially, however, Kirk contends that Cook's position was one not entitled to *Branti* protection.

Cook was hired as the Chief of the Health Assurance Section but the section name was later changed, upon Cook's recommendation, to Adult Health Services. The job description, in certain respects, seems to describe a position that might well be policymaking because of the following duties:

1. Directs a staff in the development and implementation of programs involving Medical Care, Disease Detection (etc.).

2. Serves as a member of CMT, concerned with Division wide policy development and program delivery.

3. Insures integration, through Branch Heads of Programs and harmony of policies procedures and practices within the section.

 . . . .

8. Assist[s] Deputy Director with long-range policy planning in areas affecting section programs.

 . . . .

10. Has final Section authority in the management of section resources—i.e. Budget, Personnel, and equipment. . . .

Exhibit No. 6 to Cook Deposition.

Moreover, Cook testified that one of the objectives for the position was to provide "guidance in developing policies and procedures for the program." Deposition, p. 32. It should also be noted that throughout his deposition Cook testified that he prepared "position papers," and that he was responsible for a budget, initially, of $5 to $7 million, which grew during his tenure to $20 million. Deposition, p. 35. He supervised 31 to 41 people.

Nevertheless, the court is convinced that Cook's policy involvement was limited to making recommendations, with some limited discretion into implementation. Cook was a third-tier employee who reported to the State Health Director who, in turn, reported to Kirk. Although he frequently testified about writing many "position papers," these were not documents defining policy, but rather recommendations which were "trying to convince or persuade" superiors as to actions that should be followed. These recommendations went from Cook to the State Health Director who decided whether to recommend their approval to Kirk. Cook would not approach Kirk without first going to the State Health Director. The substantial budget increases went not to increase the size of the section, or for administrative costs, but, instead, to programs that were being administered. Cook could not hire subordinates above a certain pay grade without the concurrence of the Secretary. In order to implement programs he had to persuade the "central management team, and the director, and right up to the secretary." Deposition, p. 46. Finally, Cook was told that he was not "a final policy maker." Deposition, p. 104.

Although it is a close call, the court concludes that Cook's position is not one for which political affiliation is an appropriate requirement.

With regard to Kirk's contention that Cook was fired for cause there are sufficient disputed facts to make summary disposition inappropriate.

### Rachel T. Fesmire

Class member Fesmire was employed as a Social Services Program Administrator III. In this capacity she served as the head of the Office of Day Care Services. Kirk contends that Fesmire's position was abolished by the General Assembly and, therefore, she has no standing to pursue a claim in this action. According to Kirk, in 1985 the General Assembly consolidated the Department of Administration's Office of Day Care Licensing and the Department of Human Resources Office of Day Care Services into one section within the Department of Human Resources. Kirk contends that "[i]t thus became necessary for [him] to choose a new section Chief to administer the newly combined . . . program." He asserts that he decided a newly merged office needed a new head without prior ties to either predecessor office. Hence, Kirk argues that Fesmire was not discharged,[17] but rather that her position was abolished by legislative act.

Plaintiffs have not responded to this contention. The court agrees with defendants that Fesmire was not discharged. If the complete abolition of a position by legislative act protects defendants, and the court has held that it does (*see* discussion of McQuillan, at pp. 32–33), then the consolidation of two or more positions into one job does also. Otherwise, defendants would be subject to suit by at least one jobholder for the abolition of a position by a body over which defendants had no control. The court holds that the *consolidation* of positions is, in effect, the *abolition* of several positions and the *creation* of a new one. Accordingly, Fesmire is not properly included in this class action.

Alternatively, the court will consider defendants' contention that Fesmire did

---

**17.** Fesmire remained in the Office of Day Care Services until the fall of 1985 assisting the new head of the new office in the transition. She was ultimately transferred to another position in another division within the Department of Human Resources at a lower pay grade and salary.

not occupy a position entitled to *Branti* protection. They contend that her position "involved primary policymaking and implementation for North Carolina's Child Day Care program...."

The job description provides that the director "works independently to establish and implement program goals, policies, rules, standards, and procedures for each county department of social services...." It further provides that "[t]he director is responsible for promoting the [state day care] program with various federal, state, and local groups and agencies *including legislative committees*, the *legislators*, the state day care advisory council.... Responsibilities include discussing important or sensitive issues with the Deputy Secretary and other members of Departmental Management." (emphasis added.)

Plaintiffs' principal argument is that Fesmire acted in accordance with applicable state and federal statutes, and with policies and procedures established by the Social Services Commission, under N.C.Gen.Stat. § 143B–153. The only evidence submitted in support of this is Fesmire's interrogatory answer, which is not entirely consistent with her job description. It states that she "did not have authority to promogate [sic] rules, regulations or allocate dollars without specific approval by the State Social Services Commission." Interrogatory Response No. 11. Fesmire has herself indirectly admitted that she had input into policy changes when she stated that "any procedures or criteria recommended by [her] office had to be approved by the Secretary prior to implementation." *Id.* Furthermore, plaintiffs have completely failed to respond to the sweeping provisions in the job description, which was signed by Fesmire attesting to its accuracy.

The court is persuaded that Fesmire occupied a position for which political affiliation is an appropriate requirement for effective performance.

### *George Flemming*

■ Class member Flemming was employed as Assistant Director of Disability Determinations, Division of Social Services. Defendants argue that Flemming's position is not protected by *Branti.* They argue that Flemming was involved in the "formulation of goals and priorities based upon the objectives of the Federal Social Security program."

Upon review of the job description submitted, the court concludes that Flemming did not occupy a position for which political affiliation is an appropriate requirement. The policies for the administration of social security benefits are well established. Flemming's role in its administration was as an administrator. He neither made substantive policy nor did he have any meaningful input into its formulation.

Kirk also contends that Flemming was removed because of poor job performance. He has provided no evidentiary support for this allegation beyond his own affidavit, and plaintiffs have submitted sufficient evidence to contradict this assessment of Flemming's performance. Accordingly, summary judgment is not appropriate on this ground.

### *William Gamble*

■ Class member Gamble was employed as the Business Manager at Broughton Hospital. Defendants argue that Gamble's position is not entitled to *Branti* protection. They emphasize the fiscal and personnel responsibilities of the business manager of a large hospital. Their argument is not persuasive.

Upon review of the job description, and common sense, the court concludes that Gamble's position required the exercise of professional and technical skills. It is not a position for which political affiliation is an appropriate requirement.

Kirk also contends that Gamble was removed for cause. He alleges that Gamble "harbored a lingering resentment" from a personnel action taken during the Holshouser administration which Kirk believed prevented Gamble from effectively supporting the new administration's programs and policies. Kirk further alleges that based on previous contact with Gamble he did not have confidence in Gamble's interpersonal skills. Plaintiffs deny these allegations and the court is persuaded that there is a genuine issue of fact regarding

the reason for Gamble's discharge; thus, summary judgment is not appropriate.

### Carl Hampton

 Class member Hampton was employed as Director of Samarkand Youth Services facility. Kirk contends that this position is one for which political affiliation is an appropriate requirement. The court has already concluded that the managerial and administrative responsibilities of a director of this type of institution are not of such a character that would make political affiliation an appropriate requirement for effective performance. *See* Discussion of class members Forester, Ivester, Hawley, *et al., supra.* No evidence has been submitted which would lead the court to conclude differently here. Unlike plaintiff Cayton, Hampton had no input into policy.

Hampton was suspended in June 1985 and later transferred to another position within the Division for Youth Services. Kirk argues that this transfer was for cause. Plaintiffs have submitted evidence which contradicts Kirk's allegations and sufficiently raises issues of fact which preclude summary judgment. A *Delong* inquiry also remains to be resolved.

### Steven L. Hicks

 Class member Hicks was employed as Deputy Director for the Alcohol and Drug Abuse Services Section. Defendants argue that Hicks' position falls within the *Branti* exception. According to the defendants the Deputy Director "plans, directs, and coordinates all statewide substance abuse programs." Defendants further allege that the Deputy Director serves as the section's "liaison with the North Carolina General Assembly on matters concerning substance abuse and thus is responsible for advocating administration goals...." This allegation is supported by the job description which provides, *inter alia,* that the occupant of this position,

[w]orks with federal, state, county, city, and area government bodies ... [d]evelop[s] statewide plans for alcohol and drug abuse ... [and] [a]s a member of the State Management Team, participate[s] in the development of the total mental health program for North Car-

olina. This includes planning, program development ... [and involvement] in the legislative process providing information and advocating as professional expert [sic] for division and department programs including statutes, funding, etc. ...

Plaintiffs describe Hicks' role as a primarily "consultative and technical" one. This appears to be true. They fail, however, to address his role in the legislative process or his role as a department advocate. These factors legitimately touch on concerns of political loyalty and affiliation. Accordingly, the court concludes that Hicks occupied a position for which political affiliation is an appropriate requirement for effective performance.

### Barbara B. Kramer

 Class member Kramer was employed as the Director of the State Health Planning and Development Agency. Kirk argues that Kramer occupied a position unprotected by *Branti.* As director, Kramer had overall responsibility for the agency, including routine supervisory and budgetary duties. According to the job description Kramer's primary work was *administrative* "in organizing, directing, and coordinating the planning and development of a State Health Plan ... and in the conduct of project review of proposed uses of federal funds. These activities are conducted in accordance with [The National Health Planning and Resources Development Act of 1974]."

This job description does not reveal a position which had input into substantive policymaking. The responsibilities appear to be primarily administrative, technical, and professional. Accordingly, the court concludes that Kramer did not occupy a position for which political affiliation is an appropriate requirement.

### Susanne G. Moulton

 Class member Moulton was employed as Chief of the Certificate of Need Section in the Department of Human Resources. Defendants contend that this position is one for which political affiliation is

**1402**

an appropriate requirement. The first line of the job description for the position states that "[t]his is a management level, professional position...." The rest of the description is consistent with this statement. Moulton's duties are well-defined and do not extend beyond the already established policies of Certificate of Need and Appropriateness Review Programs.

The court is persuaded that Moulton occupied a position for which political affiliation is not an appropriate requirement.

Kirk also contends that Moulton was discharged for cause. Plaintiffs have presented sufficient evidence to raise a genuine issue of fact as to the reason for Moulton's discharge. Accordingly, summary judgment is not appropriate.

### Donald L. Pagett

Class member Pagett was employed as the Director of the Black Mountain Center, Division of Mental Health, Mental Retardation and Substance Abuse Services. Defendants contend that this position is not entitled to *Branti* protection. The job description, submitted by plaintiffs, reveals a position which requires extensive administrative and professional skills. The court is persuaded that this position does not involve substantive policymaking or input beyond that which guides the operation of the institution itself. Accordingly, Pagett did not occupy a position for which political affiliation is an appropriate requirement.

Also, Kirk alleges that Pagett was discharged for cause. Plaintiffs have provided sufficient evidence to raise a genuine issue of fact as to the actual reason for Pagett's discharge and to challenge the accuracy of Kirk's allegations such that summary judgment is not appropriate.

### Thomas Corley, Ernest B. Hunt, Ronald M. Thompson, Charles Williams

Class member Corley was employed as a Personnel Officer II at Broughton Hospital; class member Hunt was employed as the Personnel Manager of the Division of Youth Services; class member Thompson for the Western North Carolina School for the Deaf; and, class member Williams for the O'Berry Center of the Division of Mental Health and Mental Retardation and Substance Abuse Services.

With regard to Corley, the affidavit of Kirk states that the

Personnel Officer II at Broughton Hospital is in charge of the administration of all personnel policy and actions for that institution, which employs over 1,600 persons. Considerable independent decision-making responsibilities are vested in this position.... [He] shares responsibility for such matters as long-range planning, articulating the goals of the hospital, recommending and implementing policy and organizational changes, assessing the classification impact of such changes, and determining budgetary requirements and managing operational budgets. He is involved in recruitment for difficult-to-fill positions by participating on specially appointed search committees.

The job description, signed by Corley, supports Kirk's affidavit.

With regard to Hunt, the affidavit of Alfred Benjamin Boyles, former Director of Personnel for the department, states:

The Personnel Manager for the Division of Youth Services is responsible for providing a full range of comprehensive personnel services to more than 800 positions located in five training schools, one regional detention center, eight regional community based consultants and a central office staff. His responsibilities include ... salary and wage administration, position classification and management ... policy interpretation ... [and] recommending and implementing policies and procedures that affect all employees in the Division....

The job description, signed by Hunt, verifies this and states that "I have authority ... at times to change policy...."

As Personnel Manager of the Western North Carolina School for the Deaf Thompson had similar duties and responsibilities for approximately 1,300 employees. The job description states that "[s]tudying new and existing positions based upon action request and needs ... [including] conducting desk audits, gathering, compiling and

evaluating positions and making recommendations ...," occupies about 10% of the time of the occupant of the position.

Williams had similar duties for some 1,200 employees at the O'Berry Center.

The court has held that the position of Personnel Director for the Department of Revenue is one for which political affiliation is an appropriate requirement. *See* discussion of Grissom, pp. 118–19. What was said there applies with equal force here. These positions are not protected by *Branti.*

To summarize, the court concludes that as to the positions held by class members Albright, Atkinson, Christian, Congleton, Corley, Fesmire, Hicks, Hunt, Thompson and Williams, and plaintiff Cayton, political affiliation was an appropriate requirement and the motion by Kirk and Flaherty for summary judgment against them will be allowed. As to the positions held by class members Cook, Davis, Flemming, Gamble, Hampton, Kramer, Moulton and Pagett, political affiliation was not an appropriate requirement and summary judgment will be entered to that effect. Remaining for factual determination by a jury are the motivational issues for the actions against class members Barham, Cook, Davis, Flemming, Gamble, Hampton, Moulton and Pagett.

### C.

### DEPARTMENT OF CRIME CONTROL AND PUBLIC SAFETY

#### Defendant Joseph Dean

Dean is Secretary of the Department of Crime Control and Public Safety. Created by the General Assembly of North Carolina in 1977 to provide "law enforcement and emergency services to protect the public against crime and against natural and man-made disasters, ... [and] to insure the preparation, coordination and currency of

military and civil preparedness plans and the effective conduct of emergency operations," N.C.Gen.Stat. § 143B–474, the Department consists of nine divisions.[18] The Department is headed by the secretary who has those powers and duties conferred on him by the North Carolina Constitution and law of the state and delegated to him by the Governor, including the power to hire and fire Department employees. There are eleven class members remaining who held positions in this department.

#### Carl Acree

Class member Acree served as the Military Executive Officer for the North Carolina National Guard and held the rank of colonel until he was discharged. According to the job description submitted by Dean,[19] the Military Executive Officer

> [s]erves as the fulltime Deputy Director,[20] Division of the National Guard with a broad delegation of authority in exercising the state required functions of the Office of Adjutant General.... Is the principal advisor to the Adjutant General regarding state operations of the National Guard.... Assists the Chief of staff in exercising the functions of his office on a day-to-day basis within the *established policies* of the Adjutant General together with State directives.... Represents the Adjutant General in coordinating legislative policies and programs ... at both State and National levels....

As such, Dean argues that this position is "directly involved in formulating and implementing policies for the North Carolina National Guard" and is not protected by *Branti.*

Plaintiffs disagree. They contend that Acree was an officer in a military organization; that he obeyed his commanding officer; that all of his decisions were with the approval of the Adjutant General; that he

---

**18.** National Guard, Highway Patrol, Alcohol Law Enforcement, Butner Public Safety, Emergency Management, Civil Air Patrol, Crime Commission, Victim and Justice Services, and Crime Prevention.

**19.** Which Acree has testified accurately reflects the duties of his position and which he signed as

accurate in January 1985. Acree Deposition, p. 42.

**20.** Plaintiffs contend that this title has never been approved by the office of state personnel; however, Acree has stated that the duties under that title were accurate. Acree Interrogatory Response No. 11.

carried out policies established by state and federal legislation; and that all of his duties were controlled by well-defined and established policies and directives. *See* Acree Deposition, p. 33.

This position is not easily analyzed. At first glance, the position seems to involve routine administrative duties, albeit in a military context. It is not at all clear, in light of the extensive federal legislation governing the National Guard, just what "legislative policies" the military executive officer assisted the Adjutant General with. Because the substantive impact of class member Acree's role is less than clear, the court is not persuaded that he occupied a position for which political affiliation is an appropriate requirement. Nor can the court say that the position *is* entitled to *Branti* protection. Thus, summary judgment is not appropriate.

### Michael Hooks

Class member Hooks was employed as an Administrative Officer I to the Wing Commander for the Civil Air Patrol (CAP). ■ Dean contends that Hooks has no standing to pursue his claim inasmuch as he is a registered Republican and was a contributor to Governor Martin's 1984 campaign. Hooks was discharged in October 1986. In his deposition Hooks testified that he was a registered Republican until he changed his registration to Democrat during the Hunt administration; that he changed back to Republican after the 1984 election; that he made a cash contribution to the Martin campaign; that he had never voted for a Democrat in his life; and, that his parents, who are Republicans, interceded for him with the Martin administration to help him obtain another job in state government. Hooks contends that he was fired to make room for someone who was more acceptable to the Martin administration; that he was not viewed by the Martin people as one of their own because he had been a Democrat during the Hunt years; and, that he was "not viewed as a strong political supporter of the Republican party in general and Governor Martin in particular." Plaintiffs' Memorandum of Law in Opposition to Dean's Motion for Summary Judgment, p. 9. Hooks, therefore, contends that he lost his job "because of his political affiliation (or non-affiliation)." *Id.*, p. 10.

■ Dean contends that Hooks is in the same position as a white person claiming discrimination by white realtors who were found not to have standing. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). The analogy does not withstand close scrutiny. In *Havens* the Supreme Court held that a white realtor did not have standing under the Fair Housing Act inasmuch as his statutory right to accurate information was met when he was informed, upon request, that apartments were available for him. The principles set forth in *Elrod* and *Branti* are premised on the constitutionally protected interest of freedom of expression. Thus, a person who, even though a member of the same political party, is fired because he was formerly a member of another political party, or supported the opponent in the election, or failed to obtain the endorsement of a necessary person, stands in exactly the same position as one who is fired because he *presently* belongs to another political party. This was recognized by the Fourth Circuit in *Jones v. Dodson* where it was said: "We recognize that the principle [of *Elrod* and *Branti*] might be thought to run as well to coerced political loyalty to individual employers (even of the same political party)." 727 F.2d at 1334, n. 6 (citations omitted); *see also DeLaCruz v. Pruitt*, 590 F.Supp. 1296, 1303 (N.D.Ind. 1984) ("It is of no moment that the discharged employee and the discharger are members of the same political party."). Thus, summary judgment on this ground is inappropriate.

■ In March 1988, following an administrative hearing, Hooks' position was found to be improperly classified as exempt. Dean, nevertheless, argues that because Hooks was "the person solely responsible for the State's relationship with the volunteer CAP and the United States Air Force" he fell within the narrow *Branti* exception. The court is not persuaded.

Plaintiffs point out that the CAP is a private corporation set up by the federal

government. Title 36, United States Code, § 201, which serves as a voluntary civil auxiliary to the United States Air Force. Title 10, United States Code, § 9441. Because of assistance this corporation provides to the State of North Carolina, the state provides some funding and two employees to assist the CAP. Hooks, in addition to acting as an administrative officer and adviser to the Wing Command, served as an "information link between the Department of Crime Control and Public Safety and the CAP." There is no indication in the material submitted to conclude he was anything more.

Hooks did not occupy a position for which political affiliation is an appropriate requirement.

### L.D. Hyde; Collin McKinne

■ Class member Hyde served as Special Assistant for Programs under a former secretary of this Department, and class member McKinne served as Emergency Communications and Special Projects Coordinator, also under a former secretary. Both of these class members were dismissed in January 1985. Their positions were *subsequently* reallocated up to "Assistant Secretary positions" in February 1985. Dean argues that this higher level position, with proposed job description, is the appropriate focus for the *Branti* inquiry. Dean is mistaken. The relevant inquiry attaches to the position held by the class member at the time of the adverse action, here—discharge. Accordingly, the court will only consider the job descriptions provided which relate to the special projects coordinator position and the special assistant for programs position.

No job description has been submitted for Hyde's position as special assistant for programs. Dean has not submitted any other materials relative to *this* position. Plaintiffs have submitted the affidavit of Hyde; however, the court concludes that it has insufficient information to perform an adequate *Branti* analysis. Accordingly, summary judgment is not appropriate.

■ With respect to McKinne, the job description provides, *inter alia*, that "[t]he primary purpose of [this] job is to assist the department secretary on a variety of matters...." The coordinator reports directly to the secretary. His work originates in special assignments by the secretary. The coordinator also initiates actions and performs special studies. The job description also provides that the coordinator has "[f]ull responsibility for bringing regulations into correct form and accurate substance then taking all legal steps to effectuate them, including public notices, conducting public hearings and filing for official adoption." McKinne has also stated that in his capacity as a staff member of the Governor's Advisory Commission on Military Affairs, he

> served as liaison between State government and the active Military presence in North Carolina.... [He] was the one point of contact to which the active military could turn to get answers and initiate action in State Government.... [W]e were able to enact legislation favorable to the active military and to retirees living here.

McKinne Interrogatory Response No. 11.

In his job description, McKinne states that his "work [was] done with minimum supervision or review and maximum personal initiative. It involve[d] personal contact with numerous persons at all levels of government...."

The court notes that this position required the occupant to work directly and closely with the secretary. McKinne has stated that he got along with all the secretaries except one. This observation is really quite beside the point. A review of the nature of his duties and close working relationship with the secretary of the Department reveals one which may demand substantial personal loyalty. As coordinator McKinne worked on special assignments directly for the secretary which may have touched on partisan concerns.

The court concludes that class member McKinne occupied a position for which political affiliation is an appropriate requirement.

### David Matthews

■ Class member Matthews served as Commanding Officer of the North Carolina

State Highway Patrol (SHP), the police organization charged with the duty of enforcing the traffic laws of the state. He was appointed by, and served at the pleasure of, the Governor. N.C.Gen.Stat. § 20–185. Matthews was responsible for "all planning, organizing, staffing, controlling, coordinating, reporting and budgeting for the Patrol" and its 1,450 employees. In addition to the obvious management implications of this position, its occupant met "with fiscal people, legislative subcommittees, etc., to ensure ample funds [were] available within the operational budget." Job Description II C.1.

██ Plaintiffs contend that one whose duty it is to impartially enforce the law does not occupy a partisan position. They further contend that Dean, himself, testified that the Governor wanted to "take politics out of" the Patrol and that he (Dean) had sought to carry out that mandate. This, of course, does not estop Dean from contending, in the context of this lawsuit, that the position involved is one not entitled to *Branti* protection. As the court has previously noted, it is fashionable, and obviously deemed desirable by candidates, to berate former administrations for basing personnel decisions on "politics" and vowing to stop the practice. Plaintiffs also contend that "[i]t is difficult to see how it could matter whether the commander was a Republican or Democrat or whether he supported Martin or Edmisten." Again, plaintiffs attempt to over-simplify the inquiry. In choosing someone for a position which does not have *Branti* protection, the executive may properly consider many criteria to assure himself that he has the loyalty, confidentiality and commitment to which he is entitled.

The SHP is a professional organization charged strictly with law enforcement. However, the *manner* in which the law is enforced and the amount of the budget devoted to it are matters of legitimate concern to a governor. The position of commander is not entitled to *Branti* protection, and Dean's motion for summary judgment as to Matthews will be allowed.

*Charles H. Long, J.B. Stewart*

██ Class members Long and Stewart were employed as Troop Commanders in the Highway Patrol. The primary responsibility of this position was to assist in providing "for effective and impartial enforcement of North Carolina motor vehicle laws." Dean argues that as members of law enforcement agencies these class members "are subject to greater First Amendment restrictions than most other citizens." He relies chiefly on *Joyner v. Lancaster*, 815 F.2d 20 (4th Cir.), *cert. denied*, 484 U.S. 830, 108 S.Ct. 102, 98 L.Ed.2d 62 (1987). This reliance is misplaced. *Joyner* involved a *Pickering–Connick* analysis, which is decidedly different from the *Branti* inquiry demanded here.

Plaintiffs contend that these positions are analogous to deputies sheriff found by the Fourth Circuit to be entitled to *Branti* protection in *Jones v. Dodson*, 727 F.2d at 1338. The court disagrees. A deputy sheriff in the normal county law enforcement organization is more akin to a trooper in the SHP. A troop commander, on the other hand, is in command of, and has control over, some 182 employees, including 2 lieutenants, 32 sergeants and 114 troopers. Although, as plaintiffs contend, his duties are primarily law enforcement related, he does have a broad range of duties including "[m]aintain[ing] good public relations," conducting "investigation[s] of improper conduct on the part of members or of complaints concerning traffic safety or law enforcement activities" and the "[d]irect[ion] and supervis[ion of] the deployment and performance of members during civil disturbances...." Job Description 2–16(F) & (K).

The image created by the Patrol can reflect favorably or unfavorably on the administration. The evenhandedness with which the laws are administered, the personal conduct by SHP employees, both on and off duty, and, especially, the conduct of SHP personnel when being used to quell a civil disturbance are all matters of direct concern to the Governor. He is entitled to someone of his choice directing those who carry out such responsibilities. Troop com-

mander is a position for which political affiliation is an appropriate requirement. Dean's motion for summary judgment as to Long and Stewart will be allowed.

### Emergency Management Division: Ruth A. Partin, Donald Rose

Partin and Rose were employed as Area Coordinators for the Emergency Management Division until they were discharged in March 1985. In May 1985 these positions were no longer classified as exempt.

The court has reviewed the job description submitted and is persuaded that these positions demanded substantial administrative and professional skills, as well as technical skills. The position has substantial discretion and responsibility, but is also clearly guided by *federal* and state legislation. *See* Title 42, United States Code, §§ 3232, 5141, 5143, 11,001 *et seq.;* 50 U.S.C.App. §§ 2281, 2286, 2288, 2289; 44 C.F.R. §§ 302.1 *et seq.* The core responsibility of this position is to assist the counties within that coordinator's designated territory with developing plans to deal with emergencies and disasters; to act as an adviser in emergencies and disasters; to insure compliance with state and federal regulations; and to provide training and education to various local officials, emergency services personnel, and the general public. *See* Partin Affidavit; Rose Interrogatory Response No. 11; and Job Descriptions.

The court is persuaded that political affiliation is not an appropriate requirement for this position making summary judgment for plaintiffs appropriate.

### J.W. Trivette

 Class member Trivette served as Special Assistant for Local Law Enforcement. The job description provides that ninety percent of Trivette's time was spent on the Crime Watch Program. As such, he was "involve[d] [in] responding to citizen's and law enforcement's requests and assisting them on a personal level in implementing Crime Prevention and or Community Watch Programs." Ten percent of his time was spent investigating "complaints from citizens about local law enforcement and reporting findings to the Secretary of Crime Control, [the] complaining party and

[the] Governor's Office." Dean argues that because Trivette was "responsible for conducting studies, preparing proposals and advising the Department, the public and other agencies about Crime Prevention" he occupied a position that is not protected by *Branti.* The court is not so persuaded.

The subject matter of Trivette's position—Crime Prevention and Law Enforcement—is obviously sensitive, important and of partisan concern. However, plaintiffs convincingly argue that this position required specialized knowledge regarding crime prevention and technical assistance to law enforcement. Trivette was under the direct and close supervision of the Division Director and the material submitted suggests that he did not have meaningful input into policymaking and that on matters of policy he was subject to directions from higher levels in the Department. His role was largely as an informational liaison to both state government and North Carolina citizens.

The position occupied by Trivette is not one for which political affiliation is an appropriate requirement.

 Dean also contends that Trivette voluntarily retired. Trivette's position was exempt from protection by the State Personnel Act at the time Dean became secretary of the Department. Effective 1 May 1985, the position was removed from exempt status and Trivette was so notified by a letter from Dean dated 15 May 1985 which explained the effect of the reclassification and concluded "[w]ith best wishes and appreciation for your continued service to the State." In a brief memorandum dated 24 June 1985 Trivette announced his retirement, effective 1 July 1985, noting that on 30 June he "will have 30 years of service." Bruce Marshburn, who was Director of the Crime Prevention Division at that time, has testified, by affidavit, that Trivette was not asked or forced to retire.

Plaintiffs contend that Trivette was forced to retire, relying on Trivette's answer to interrogatories in which he states that he was told by Bruce Marshburn that "he was no longer needed," that his duties

and responsibilities were reduced to a "make-work" job, and that he was allowed to stay on the job for a couple of months until he was eligible for retirement. These assertions create a genuine issue of fact making summary judgment inappropriate. Even though plaintiffs have failed to respond to Dean's argument that, at the time of his retirement, Trivette was in a position subject to the protection of the State Personnel Act, under which he could only be discharged for cause, the fact remains that he still falls under the class definition as he occupied an exempt position between 6 November 1984 and 7 January 1985 and contends that he was subjected to adverse personnel action because of his political affiliation or activities. Dean is not entitled to summary judgment on the Trivette claim.

### Maurice R. Edmonston

Class member Edmonston was employed as the Director of Public Affairs for the Department. Dean argues that this position is explicitly not protected by *Branti*. 445 U.S. at 518, 100 S.Ct. at 1294. The job description provides, *inter alia*, that the primary purpose of this job is to "[p]lan and supervise a public information and relations program to keep citizens abreast of services provided by the eight divisions of the department and [to] ensure good communications among the departments." In the course of this job, the director prepared news releases which Edmonston has stated that he researched, wrote, edited and produced. He further stated in his job description that he prepared speeches "[a]t the direction of the Secretary, [he] research[ed], wr[o]te, and edit[ed] numerous speeches concerning the department Programs for delivery by the Secretary. [He] also [did] the same for the Governor's Office upon request." Finally, Edmonston has acknowledged that his position required "constant contact with the public, news organizations, legislators ... [and] with policymaking employees in the department divisions to work with them on their needs for public information programs."

The court is persuaded that this is a position which demands close working relationships with policymakers, and involves subject matter that is or may be sensitive and touches on partisan concerns. Plaintiffs' argument is basically that Edmonston's news releases and proposed speech drafts were objective, informational pieces without political content or concern. The court is not persuaded by this characterization. The drafting of a news release or speech necessarily includes a subjective element as, for example, which facts or incidents will be highlighted, or how they will be portrayed. Presumably, a professional in this position would responsibly report things as they happen. However, the court is persuaded that the occupant's political affiliation could interfere in the effective discharge of his duties such that the employer could legitimately be concerned and discharge him.

The court concludes that Edmonston occupied a position for which political affiliation is an appropriate requirement.

To summarize, the court concludes that as to the positions held by class members Edmonston, Long, Matthews, McKinne and Stewart political affiliation was an appropriate requirement, and Dean's motion for summary judgment against those class members will be allowed. As to the positions held by class members Hooks, Partin, Rose and Trivette political affiliation was not an appropriate requirement and summary judgment will be entered to that effect. The court is unable to make a summary decision with regard to the positions held by class members Acree and Hyde. There also remains for determination the voluntariness of Trivette's retirement.

### D.

### DEPARTMENT OF CULTURAL RESOURCES

#### Patric G. Dorsey

The duties of the Department of Cultural Resources are set forth in N.C.Gen.Stat. § 143B–50, which provides, in part, that: It shall be the duty of the Department to provide the necessary management, development of policy and establishment and enforcement of standards for the furtherance of resources, services and

programs involving the arts and the historical and cultural aspects of the lives of the citizens of North Carolina.

Four class members remain in this department which defendant Dorsey heads.

### Constance Hawthorne

 Class member Hawthorne was employed as the Administrative Assistant III for a former Secretary of this department and for Dorsey until she was demoted and transferred in May 1986. Dorsey argues that this adverse personnel action "is not substantially equivalent to dismissal and Ms. Hawthorne has suffered no injury." While Hawthorne did not suffer a reduction in pay, her pay grade was substantially lowered, thus limiting future salary increases. As such she did suffer an injury. That observation does not, however, end the inquiry as there must be an analysis under *Delong* on the choice Hawthorne faced when she was demoted. There are genuine issues of material fact in this regard making summary judgment inappropriate.

Dorsey does not contend that this position is one for which political affiliation is an appropriate consideration.

### David N. McKay

 Class member McKay served as Director of the State Library Division from the Holshouser administration until 1985 when Dorsey discharged him. Dorsey contends that as one of the highest ranking persons in the department hierarchy, as well as one of the highest paid, McKay occupied a position for which political affiliation is an appropriate requirement. Plaintiffs contend McKay occupied a "professional position."

The job description states, *inter alia*, that the Director of the State Library System is responsible for "drafting legislation, informing legislators, interpreting policy or guidelines ... and serving as a library expert on official committees." Dorsey further contends that McKay played a large role in developing and planning programs throughout the library system and had substantial public contact. These allegations

are supported by McKay's deposition testimony. However, McKay contends that his main function was to render professional opinions to his supervisor about the state library and the public library system. McKay Deposition, p. 38.

Even though McKay held a position that was "professional" in character, the court is persuaded that the responsibility of the position, especially as it relates to the Legislature, is sufficiently broad to make political affiliation an appropriate requirement.

### Richard Sawyer

 Class member Sawyer was employed as the Sites Administrator and head of the Historic Sites Section of the Division of Archives and History.[21] Dorsey contends that this position had "impact ... on areas where partisan political disagreement could occur." Plaintiffs contend that Sawyer occupied a purely professional position.

The job description for this position provides, in part, that:

The Historic Sites Section has the responsibility to develop and conduct a program which will meet the state's current and foreseeable future needs in the field of history as it relates to historic places and things. Such a program involves research, acquisition, preservation, and restoration plus the development of an intrepretive [sic] program for each of the State Historic Sites.

Based on division organization, areas of administration of the section include:

1. Policy responsibilities. Implement basic divisional policies essential to the conduct and control of the work of the section. This is to apply not only to policy in initiating work programs for the section but staff policy as well; i.e., policy on acquisition of sites and artifacts, on preservation, appropriate use, and reconstruction of historic buildings, as well as qualification of staff, determination of staff schedules and site visiting hours.

2. Planning. a. Upon determination of purpose and objectives for the section, develop comprehensive plans, both long and short range, based on overall and

---

**21.** This position was no longer classified as "exempt" as of May 1985.

immediate need. This necessitates a determination of priorities. b. Organize section staff with a view toward its growth as the need arises, and geared to achieve results as outlined in the objectives.

3. Administration. a. Fiscal responsibilities—Recommendations for preparation of the budget and responsibility for its expenditure include everything from office supplies to capital improvements and restoration costing hundreds of thousands of dollars including both state-owned properties and local projects receiving state or federal aid....

The job description and Sawyer's deposition testimony reveal that he had a public relations role that was significant.

Upon a full review of the materials presented, the court is persuaded that this position is one for which political affiliation is an appropriate requirement.

### Lawrence Wheeler

 Class member Wheeler served as the Deputy Director for this department until March 1985. He was the only Deputy Secretary for this department. Dorsey argues that this high level position is one for which political affiliation is an appropriate requirement. The court agrees. Plaintiffs again urge the court to consider defendant Martin's assertion, made earlier in this action, that none of these positions required political affiliation. Plaintiffs further argue that this position should be viewed as strictly "professional" since the Martin transition team recommended that Wheeler be retained because of his "professional competence." The court is unpersuaded.

As Deputy Director, Wheeler

coordinate[d] professional program details which needed action by the Secretary and ... recommend[ed] action to the Secretary ... advise[d] [the] Secretary on general budgetary needs and policy direction for [the] Department [and] ... help[ed] [the] Secretary devise budgetary strategies for the legislature.

Wheeler Interrogatory Response No. 11; see also excerpt of job description submitted by defendant Dorsey.

Wheeler's necessarily close working relationship with the Secretary, as well as his own admission that he participated in budget formation and policy directives for the department as a whole, indicate that he occupied a position for which political affiliation is an appropriate requirement.

To summarize, the court concludes that as to the positions held by class members McKay, Sawyer and Wheeler political affiliation was an appropriate requirement and Dorsey's motion for summary judgment against them will be allowed. There is insufficient information before the court on which to make a decision as to the injury suffered by class member Hawthorne.

### E.

### DEPARTMENT OF NATURAL RESOURCES AND COMMUNITY DEVELOPMENT

#### S. Thomas Rhodes

Rhodes is the current Secretary and head of the department. N.C.Gen.Stat. § 143B–276 provides that:

It shall be the duty of the department:

(1) To provide for the management and protection of the State's natural resources and environment;

(2) To promote and assist in the orderly development of North Carolina counties and communities; and

(3) To provide job training and promote employment for economically disadvantaged persons.

 Rhodes has provided very little evidentiary support for his motion, and in many instances this is immediately fatal. As the court has previously noted, on the question of whether a position is one for which political affiliation is an appropriate requirement, the burden of proof is on the public employer. See Branti v. Finkel, 445 U.S. at 518, 100 S.Ct. at 1294. Accordingly, in order to prevail on summary judgment Rhodes must produce some evidentiary support for the factual allegations contained in his memorandum. He has attempted to do that by providing the court with an affidavit, signed by Susan B. Hutchins, Director of the Division of Per-

sonnel for the department. That affidavit, however, contains no statements of fact by the affiant. Rather, it attempts to include the memorandum in support of the motion by reference and verify everything contained therein. That affidavit states, *inter alia,* that Hutchins is "personally familiar with the facts surrounding the resignation, withdrawal or termination ... of the class members ... that she has read the facts presented as to each class member and the exhibits so attached and to the best of her ability [sic] the matters so stated and attached are true...." This affidavit does not constitute a substitute for evidentiary materials supporting the facts alleged in Rhodes' memorandum.

There are thirty-one remaining class members who were or are employed in the Department of Natural Resources and Community Development.

### Jan L. Allen

Class member Allen was employed as an Administrative Secretary V in the Division of Employment and Training. In May 1985 Allen's position was designated "non-exempt." In August 1985 Allen's new non-exempt position was, according to defendant Rhodes, abolished as a result of a reduction-in-force. She was subsequently rehired as the secretary to the division director in the Division of Community Assistance of NRCD. Rhodes has provided a copy of Allen's notice of termination which includes the proposed explanation of the reduction-in-force which led to the initial termination, but has provided no other evidentiary materials. Since plaintiffs allege that the adverse actions were taken for political reasons and not because of a "reduction-in-force," there is a genuine issue of material fact remaining with respect to the reason for plaintiff Allen's termination.

■ The court has previously noted that the occupant of a *position* that is abolished by legislative act has no standing to challenge his dismissal. That is quite different, however, from a legislative decision to reduce the force of a department or

section with the executive having the discretion as to which positions will be eliminated to meet the reduction. In this event the executive may not eliminate one job, rather than another, for partisan political reasons. Thus, summary judgment is inappropriate.

There has been no contention by Rhodes that Allen's position is one for which political affiliation is an appropriate criteria.

### Jimmy Allred

■ Class member Allred was employed as the Director of the Office of Rural Private Industry Councils. Rhodes argues that Allred held a position for which political affiliation is an appropriate requirement. A job description has been submitted [22] which provides, in part, that:

> The primary purpose of this position is to provide professional managerial supervision over the planning and grants management aspects of all CETA programs operated by the Balance of State Section. Work is highly technical in nature; the incumbent is responsible for compliance by the Division of Community Development....

This description does not illustrate a position for which political affiliation is an appropriate requirement. The duties are professional and administrative, and the planner is obligated to follow detailed guidelines set forth either by statute or more senior officials. The court concludes that political affiliation is not an appropriate requirement for this position.

### William T. Banner

■ Class member Banner was employed as a Forestry Supervisor III. In July 1985 he was demoted to Forester III. Rhodes contends that Banner is not properly included in the class because in May 1985 Governor Martin redesignated Banner's position as non-exempt and, therefore, Banner did not occupy an exempt position when he was demoted. Rhodes' argument is not persuasive. Banner's posi-

---

**22.** This is the same job description submitted for class member McAddo who was employed as a Planner under class member Allred.

tion was exempt at a "point during the period from 6 November 1984 to 7 January 1985" as required by the class definition.[23] Banner, like several other class members, was not discharged. Whether the injury suffered by such class members (demotion by Banner) was the functional equivalent of a discharge requires, of course, a *Delong* analysis. Although some of the actions may not facially appear to meet the test, the court has concluded that, for most of them, summary adjudication is inappropriate.

Accordingly, Rhodes' motion for summary judgment on this ground will be denied.

There is no contention that this position is one for which political affiliation is an appropriate requirement.

### James T. Brown

Class member Brown was employed as Chief of the Fishery Services Section until he retired on 7 November 1987. Rhodes contends that this retirement was voluntary and has offered Brown's letter of resignation as evidentiary support. This letter neither supports nor undermines Rhodes' argument. Plaintiffs contend that Brown retired after suffering continued harassment designed to coerce him to resign from his position. Brown further contends that this harassment was because of his political affiliation. *See* Brown Interrogatory Response No. 3.

Since the reason for Brown's separation from employment with the Fishery Services Section is disputed, summary judgment on this ground is inappropriate.

There is no contention that the position is one for which political affiliation is an appropriate requirement.

### Neil G. Cashion, Jr.

■ Class member Cashion was employed as an Assistant Regional Manager. Rhodes argues that Cashion's position was eliminated from the Secretary's office,[24] and that Cashion occupied a position for

which political affiliation is an appropriate requirement. Plaintiffs argue that the position involves "administrative coordination responsibilities" and is not one for which political affiliation is an appropriate requirement.

Rhodes has submitted a job description which provides, in part, that:

This position will provide administrative support to the Winston–Salem Field Office Manager. Work will also involve contact with the general public as related to complaints against the Department, as well as general inquiries....

The employee will assist the Field Office Manager in maintaining communication and coordination among the varied functional areas of the Field Office. Involvement will extend to the interpretation and administration of Departmental rules, regulations and procedures....

Upon review of this description the court concludes that Cashion did not occupy a position for which political affiliation is an appropriate requirement.

### Cornell W. Chappell

■ Class member Chappell was employed as an Administrative Assistant II. In his memorandum, Rhodes has set forth excerpts from a purported job description. He has failed, however, to provide a copy of the job description or any other evidentiary support for his argument that Chappell held a position for which political affiliation is an appropriate requirement. Accordingly, Rhodes' motion for summary judgment as to this class member will be denied.

### J. Donald Chappell

■ Class member Chappell was employed as Deputy Director for the Division of Employment and Training. Rhodes contends that Chappell held a position for which political affiliation is an appropriate requirement.

---

**23.** *See* orders dated 7 December 1987 and 18 December 1987.

**24.** The position was allegedly returned to the Division of Parks and Recreation where it origi-

nated and was originally funded and classified as a "Parks Designer" II. Rhodes has provided no evidentiary support for this argument.

Plaintiffs have submitted a job description for this position which provides that the primary purpose of the job is

> To provide management for the operations and activities of the Division of Employment and Training. The Division is responsible for the administration of the Job Training Partnership Act (JTPA) for the State of North Carolina.... [T]he United States Department of Labor has allocated in excess of 100 million dollars for program years 1983–84 to the State of North Carolina for employment and training programs.
>
> The primary functions of the division are policy development and council support, planning ... finance ... education ... information and civil rights compliance.

The accuracy of this description was attested to by Chappell.

The job description further provides that he "[a]ssumed responsibility for the Division when the Director [was] absent...." As Deputy Director Chappell also had supervisory duties over the Civil Rights Compliance Officer for the Division, the Planning and Program Management Coordinator (who handled grant applications and allocations) and the Policy Development and Council Support Coordinator (who developed policy for delivery of the Division's programs).

The court is persuaded that J. Donald Chappell's position as Deputy Director demanded the exercise of judgment and discretion that touched on partisan political concerns. His oversight of the allocation of millions of dollars, as well as input into policymaking, make his position one for which political affiliation is an appropriate requirement.

### Annie Y. Cruze

Class member Cruze was employed as the secretary to the Assistant Director of the Division of Marine Fisheries in Morehead City, North Carolina. Rhodes contends that Cruze voluntarily resigned her position and, as proof, has offered her letter of resignation. This letter does not support defendants' argument that her resignation was voluntary. If anything, the tone and phraseology of the letter support plaintiffs' argument that the resignation was the result of adverse action taken by defendants, including a substantial reduction in Cruze's responsibilities, i.e., a demotion.[25] Cruze contends that she believed the actions were intended to force her to resign.

Rhodes has failed to produce sufficient evidence to support his argument that the resignation was voluntary. Accordingly, the motion for summary judgment as to this class member will be denied.

There is no contention that this position is one for which political affiliation is an appropriate requirement.

### Danny Ray Fry

Class member Fry was employed as a Departmental Purchasing Officer IV. Rhodes argues first that Fry was discharged for cause, and alternatively, that Fry occupied a position for which political affiliation is an appropriate requirement. Rhodes has provided no evidentiary support for either argument. Plaintiffs have, however, provided an extensive job description which provides, in part:

> as Departmental Purchasing Officer Fry [s]upervise[d], direct[ed], and control[led] all direct activities of purchasing personnel[;] ... [a]dvise[d], inform[ed] and direct[ed] all personnel within the department relative to purchasing policy, practices and procedures[;] ... [p]repare[d] specifications and competitive product terminology[;] ... [d]etermined competitive sources of supply ... review[ed] quotations ... and evaluate[d] products proposed....

More succinctly stated, Fry described his ultimate responsibility as "effective and economical acquisition, management and disposition of goods and services." This

---

**25.** "The reorganization of Marine Fisheries has clearly pointed out that assignments have not been made on the basis of ability, skill, experience, nor [sic] expertise, especially those in the clerical category. I, therefore, do not feel that I am being utilized to the fullest extent.... Being placed in a position with no responsibilities will do nothing to utilize my abilities for the State."

statement could be broadly construed to support Rhodes' argument; however, the court is convinced that while this is obviously a very important position, the skills demanded are professional and administrative.

Fry did not occupy a position for which political affiliation is an appropriate requirement.

### Alice D. Garland–Swink

■ Class member Garland–Swink was employed as an Assistant Deputy Secretary within the NRCD. Rhodes contends that this position was abolished when the department was reorganized. Rhodes also argues that Swink occupied a position for which political affiliation is an appropriate requirement.

According to Garland–Swink's deposition testimony, as an Assistant Deputy Secretary she had substantial budget and office responsibilities. She

> handled the Department budget process from the Secretary's office.... The Deputy Secretary was responsible for putting together the budget requests annually for the legislature, and [she] oversaw that process. [She] also coordinated projects ... [and] was de facto office manager for the whole Secretary's office ... [she] supervised the staff ... and opened mail.

Deposition, pp. 16–17. Garland–Swink also conceded that this was a confidential position as she "was privy to, generally, everything that went through [the Deputy Secretary]", Deposition, p. 17; that she advised the Deputy Secretary on policy matters and drafted policy statements, p. 18; and that her position allowed her to make recommendations on policy or to assist in the formulation of policy. *See* Deposition, pp. 19, 23, 35 and 41.

While plaintiffs correctly point out that Garland–Swink's role as a spokesperson for the department was limited to statements on already established policies, a review of her entire deposition testimony reveals a position that had substantial input into policymaking decisions. Accordingly, the court concludes that Garland–Swink occu-

pied a position for which political affiliation is an appropriate requirement.

### Shirley U. Gold

Class member Gold was employed as a Program Analyst. Gold's response to defendants' joint interrogatories states, *inter alia*, that her responsibilities included:

> a. ... [E]valuat[ing] NRCD programs in order to determine the level of organizational effectiveness and identify[ing] ways to improve goal achievement and productivity.
>
> b. ... provid[ing] management consulting services to the divisions and programs.
>
> c. ... manag[ing] staff and management developing programs.
>
> d. [Managing various employee programs.]

Rhodes contends that Gold's position was "technically abolished." He contends that the department concluded that these responsibilities were efficiently provided by other personnel and that the separate position was not necessary. Gold contends that she was terminated because she was a registered Democrat and actively supported the party and Democratic candidates.

Rhodes has provided no further evidentiary support for his argument. Thus, there are genuine issues of fact as to the reason for Gold's termination such that summary judgment is inappropriate.

There is no contention by Rhodes that this position was not protected by *Branti*.

### Horace J. Greene

Class member Greene was employed as Director of the Division of Forest Resources. Rhodes contends that this position is one for which political affiliation is an appropriate requirement. According to Greene, "[a]s director [he] was in charge of all activities in the day-to-day operation of the division...." His duties included budget preparation and control, developing programs, and coordinating and working with other agencies. *See* Greene Interrogatory Response No. 11. Rhodes contends that as director Greene had final authority

in the creation and implementation of policy. Rhodes has failed to provide any evidentiary support for this argument. On the other hand, plaintiffs contend that Greene's position did not involve matters touching on partisan concerns and that policy for the Division of Forestry was largely set by the Forestry Council pursuant to N.C.Gen.Stat. § 143B–308.

Again the court feels that there are contested issues to be resolved before a decision under *Branti* can be made.

Rhodes also argues that Greene was terminated for cause, but he has failed to offer any evidence to support the argument. Thus, summary judgment on this ground is not appropriate.

### Anne T. Griffith

■ Class member Griffith was employed as a Program Analyst. Rhodes contends that Griffith held a position for which political affiliation is an appropriate requirement. Rhodes characterizes her position as a "legislative liaison to the General Assembly from NRCD."

Plaintiffs have offered Griffith's affidavit as well as a "work plan/performance review" (WPPR) which she prepared. According to Griffith's affidavit, it was her "responsibility to track and communicate the progress of issues and legislation pertinent to the Department of Natural Resources and Community Development." She further states that she was "not responsible for the development of the Department's legislative policy or agenda, nor was [she] responsible for determining the Department's position with respect to particular legislation." She does concede, however, that it was her

> responsibility to monitor legislative bills and other matters which related to the Department and to keep the Secretary advised as to such legislative issues. In addition, if a committee was meeting on a bill sponsored by the Department, it was [her] responsibility to coordinate the witnesses who would testify on behalf of the Department. If the Legislature requested a speaker from the Department with respect to a particular bill, it was [her] responsibility to contact the Secre-

tary, who would then determine who would speak on behalf of the Department, and [she] would make the logistical arrangements regarding the presentation of testimony.

Griffith's affidavit also states that she was not free to, nor did she, take a position on behalf of the department with respect to any legislative issues which had not been previously established by the Secretary. Most telling, however, is her concession that "it was [her] responsibility to advocate on behalf of department positions." Irrespective of whether the Secretary solely determined policy, Griffith's position as an advocate of that policy in such a critical role before the legislature leads the court to the conclusion that Griffith held a position for which political affiliation is an appropriate requirement.

### Field Office Managers: William H. Hodge, Robert F. Joyce, Donald W. Lahuffman, Milan J. Muzinich, Bobby R. Stott

■ Class members Hodge, Joyce, Lahuffman, and Muzinich, and plaintiff Stott were employed as Field Office Managers with the department. Rhodes contends that these positions were ones for which political affiliation is an appropriate requirement for effective performance. Rhodes' memorandum states that the occupants of these positions were "responsible for tying together the efforts of the representatives of the several NRCD divisions working in each regional office." In addition to administrative functions, Rhodes alleges that these managers were "official spokesm[e]n for the ... [NRCD] out in the field. It will be [their] responsibility to handle inquiries from the media regarding departmental activities. In addition, [they] will be the contact [men] for the general public to come to with questions regarding the department's programs and state government in general." Rhodes has failed to provide any evidentiary support for his allegations or this quote.

Plaintiffs have provided the following job description for regional managers: "[t]he regional manager serves as chief administrative officer for the region[,] ... super-

vises[,] and is responsible for administrative support for regional programs." The description also provides that these managers are "member[s] of the Secretary's executive staff and represent[ ] the Secretary as requested throughout the region." The regional manager also visits and maintains contacts with local government officials, and public and private organizations. "The regional manager will address civic groups, environmental groups, business organizations and public officials for the purpose of communicating NRCD programs." The accuracy of this description has not been attested to by the signatures of the job holders.

In addition to this description the court has reviewed available interrogatory responses and the deposition testimony of these class members. Hodge alleges that he was involved in program development and implementation, "[a]ssist[ed] [the] Regional Housing Specialist in locating developers to construct low cost housing[, and] ... [e]valuate[d] LWCF (BOR) grants to determine equitable distribution of funds." Interrogatory Response No. 11. Hodge also testified that he reported directly to the Secretary's office. Deposition, p. 7. *See also* Muzinich Deposition, p. 9.

Most telling is the deposition testimony of class member Muzinich. According to Muzinich as regional manager it was his job, *inter alia*,

> to maintain and coordinate the different activities within the Department ... in the twenty-one counties that [his regional office was] responsible for.... Many times there were breakdowns in lines of communication within [sic] staff people and the local elected officials and [he] many times had to repair those. [He] visited with local city and county elected officials ... periodically. [He] met with groups within the counties and communities. [He] was *promoting NRCD's policies* and many of their programs.... [He] traveled at times with the Secretary and with the various division directors to *promote ... programs, to promote the policy of the department and of the State and of the State Legislature....* [He] assisted elected state senators and representatives in resolving some of the problems that they may have within their constituency. This required many times constant contact with these legislators....

Deposition, p. 11. The only qualification Muzinich made during his testimony was to add that "with seven regional offices across the state ... the duties of each manager varied with each office[;] ... [t]here were varied responsibilities and varied duties." Deposition, p. 12. In the context of this testimony, however, it was clear that this variation had to do with particular division programs that may be peculiar to certain regions. For example, Muzinich highlighted the fact that as regional manager for the Wilmington office he was involved with the Division of Marine Fisheries. Obviously, the regional manager for an office located in the western part of the state would deal with different programs and divisions.

The tenor of Lahuffman's deposition testimony is somewhat different. His testimony stresses the role of regional managers as advisors and assistants to the various programs and divisions. He further stresses that regional managers were somewhat powerless; that they did not have hiring and firing power; that they were not in the chain-of-command; and, that they did not formulate policy but merely acted as "policy implementers." Deposition, pp. 19–20. However, Lahuffman did testify that "[a]s regional manager [he] was very visible and very high profiled [sic] in responding to media inquiries regarding environmental problems that occurred in the eleven county region that [his office] served." Deposition, pp. 21–22. Among the documents attached to Lahuffman's deposition, which were apparently submitted by him at the deposition, is a paper written by Lahuffman entitled "Organizational Dilemma: The Role of the Regional Manager in a State Government Agency." This paper's focus was a concern over the department's treatment of the regional manager position, that is, how the position is ignored and how managers feel powerless. Included in the paper is an outline of the obligations or duties of re-

gional managers which include the following statements:

Managers have an obligation ... to interact with local officials and the media, and to represent the department in the region.... Managers also have an obligation to represent the Secretary in the region and to provide a departmental perspective on policy interpretations in departmental issues in the region.

Plaintiff Stott's deposition is somewhat less enlightening. The only substantive information gleaned there was that plaintiff Stott was regional manager for the Raleigh office, which means he was responsible for a sixteen-county area. Stott also testified that it was part of his job to talk to the news media. Deposition, p. 22.

While all of these class members deny that their role was policymaking, and urge the court to view their spokesperson roles as limited to presenting already established policies, the court is persuaded that these positions are ones for which political affiliation is clearly an appropriate requirement. Many state employees must deal with the public, often on a daily basis; many are involved in providing services and implementing the benefits state government provides to its citizens. Clearly, many of these positions are ones for which political affiliation is not an appropriate requirement; such positions merely require professionalism and courtesy to the public. The positions under review require something more. While regional managers may not have substantial personnel powers or integral roles in policymaking, they do appear to act as spokespersons for the department as a whole, the Secretary, and Governor Martin. In their role as troubleshooters, and as liaisons between assorted programs and activities of the NRCD, these managers must necessarily exercise a considerable degree of personal judgment. This may take form in the way in which they express policy to the public, to legislators, to division heads, and other local officials with whom they deal. While much of the job description reveals an administrative and professional position, their high visibility, as well as their frequent close contacts with the Secretary's office, persuade this court that the Secretary, and

therefore the Governor, were entitled to place persons in these positions who would best promote their programs and policies. While the regional managers may not have had a role in formulating the policy that would guide all of the statewide programs, they obviously played a very important role in seeing not only that the policy mandate was carried out, but in promoting and expounding upon the administration's programs. Plaintiffs' emphasis on the fact that these were not policymaking positions ignores the relevant law which has since followed *Elrod v. Burns.* As this court has stated, it is not restricted to the policymaking analysis. Under *Branti v. Finkel,* the positions occupied by these class members and plaintiff Stott are not entitled to constitutional protection.

### Catherine H. Lassiter

According to Rhodes, class member Lassiter was employed as an Administrative Assistant I. She was then transferred out of this exempt position into a Clerk/Typist IV position in the Division of Employment and Training, with no cut in pay. This division was then reorganized and Lassiter was offered another position, and that position was "reallocated down to a lower pay grade, [but] she had no ... cut in her salary." Though not expressly stated, apparently Rhodes' argument is that Lassiter has not suffered an adverse action and does not belong within the class. Rhodes has provided no evidentiary support with respect to this argument.

According to plaintiffs, Lassiter was an office manager for the NRCD administrative offices. They allege she was removed from the position and demoted to a position of lower grade and responsibility in April 1985. These disputed issues of fact make summary judgment inappropriate. While Rhodes' memorandum states that Lassiter's "duties were of a confidential nature" no argument is made that she occupied a position for which political affiliation is an appropriate requirement.

### Arch McAddo

Class member McAddo was employed as a Master Planner in the Division

of Employment. Rhodes has submitted a job description for this position and argues that a reading thereof illustrates that McAddo was "in a position of trust, supervision and responsibility." Apparently this is Rhodes' attempt to argue that the position is one for which political affiliation is an appropriate requirement.

According to the job description:

The primary purpose of this position is to provide professional managerial supervision over the planning and grants management aspects of all CETA programs operated by the Balance of State Section. Work is highly technical in nature; the incumbent is responsible for compliance by the Division of Community Employment with the requirements of newly issued Federal Regulations....

Further review of the job description illustrates that this position is one which entails substantial responsibility and requires professional, technical and administrative skills. The policy implementation, however, is strictly prescribed by federal regulations. There does not appear to be room for the exercise of independent judgment and discretion beyond that of any ordinary administrative professional. Additionally, plaintiffs convincingly argue that this job description is outdated. They contend that "[f]ollowing the end of the CETA program the Job Training Partnership Act was the enabling legislation for the employment and training efforts of the state and responsibilities of individuals within the division changed to reflect the revisions in federal legislation."

The court concludes that McAddo held a position for which political affiliation is not an appropriate requirement.

### Lester Moore

Class member Moore was employed as Director of the Division of Economic Opportunity. Rhodes argues that Moore held a position within the *Branti* exception, but he has again failed to provide any evidentiary support for his argument. Plaintiffs have, however, provided the court with a copy of a memorandum from Moore to class member Paul Sebo which sets forth the responsibilities of his agency. As director, Moore was in charge of administer-

ing the Community Services Block Grant Program (CSBG), which is (at least in part) funded by the United States Department of Health and Human Services. "The Division is responsible for making CSBG grants to local agencies for programs and services having a measurable impact on the causes and conditions of poverty...." Moore's memorandum also states that the "Division's approach has been to place emphasis upon direct program services to the poor rather than administration...." The meaning and impact of this statement is less than clear.

The court holds that there is not sufficient evidence before it to decide the question on summary judgment.

### James H. Moses

Class member Moses was employed as Community Development Specialist II Chief, Parks and Recreation Consulting Department of NRCD. Rhodes argues that Moses held a position for which political affiliation is an appropriate requirement, but once again has failed to provide a job description or any other evidentiary support for his argument. Plaintiffs have, however, submitted a copy of Moses' job description.

According to plaintiffs' documents, the Consulting Services Section

is changed [sic] with the responsibilities of providing park and recreation advisory, consulting and planning assistance to local units of government, the private agency, and commercial (for profit) agencies/organizations. This "outreach" program provides education (in-service training) programs for professionals and lay persons. Also, federally funded programs are administered, technical bulletins developed, and liaison maintained with clientel [sic] agencies and colleges/universities.

Work Plan/Performance Review (WPPR), 10/83, p. 1. Upon review of plaintiffs' documents, it is apparent that there are inconsistencies with respect to Moses' description of his duties and responsibilities. In his job description Moses has stated that "[t]he job's primary purpose is to *work*

*with* city and county administrators and *policymakers* to evaluate existing park and recreation systems, determine needs, and implement programs of grant-in-aid assistance...." (emphasis added). Moses also states

[g]uidance is given this Section by the Division Director, and Secretary of Natural Resources and Community Development. About twice yearly, we review programs, consulting and planning services ... and general direction. Both Division Director and Secretary make suggestions and discuss ideas on future direction. Implementation of programs (existing or new) remains with [the] section chief.

These statements could support the argument that Moses had input into policy-making or an expansive role in meaningful policy implementation. However, the terms and programs at issue are somewhat unclear. Furthermore, Moses has also stated that "[t]he section works within the framework of all policies, procedures, and guidelines of the State, Department and Division. We use manuals...." Moreover, Moses' response to defendants' joint interrogatories states "never did I make policy." Other statements within Moses' job description seem to imply that the policy direction of his section was strictly controlled by outside sources (federal legislation, state legislation, departmental policy changes, etc.).

After full review of all documentation provided, the court is not satisfied that there is adequate evidence on which to base a decision whether Moses held a position for which political affiliation is an appropriate requirement.

### Paul G. Sebo

■ Class member Sebo was employed as Director of Citizen Affairs and Civil Rights. Rhodes argues that Sebo held a position for which political affiliation is an appropriate requirement. He has submitted a copy of the "Decision and Order" of the State Personnel Commission which reviewed Sebo's exempt status, copies of correspondence involving Sebo, and a copy of the "Position Exemption Investigation Report." Rhodes has not submitted a separate job description for Sebo's position. Plaintiffs have, however, submitted a description of the "Office of Citizens Affairs and Civil Rights Compliance" which includes a description of Sebo's position as Civil Rights Compliance Officer.

The description is not particularly detailed. It provides that the office

is responsible for the accurate and expedient processing, routing, and resolution of citizens' complaints and requests for information concerning the department. This office serves as the citizens' link to the divisions and programs of the department and serves as the Secretary's liason [sic] to the citizens of North Carolina.

The description further provides that

[t]he Civil Rights Compliance Officer and Assistant are responsible for the annual updating, development, implementation, and distribution of the departmental Affirmative Action Plan.... The Civil Rights Compliance Officer is responsible for personally "signing off" or approving *all* departmental personnel transactions to insure compliance with Affirmative Action hiring procedures. (emphasis in original).

The Order of the State Personnel Commission and the correspondence submitted by Rhodes are largely irrelevant. Those materials deal with the propriety of Sebo's "exempt" classification under N.C.Gen. Stat. § 126–5. That determination, as the court has previously held, is not a substitute for the constitutional inquiry demanded by *Branti*.

On the other hand, the investigation report submitted by Rhodes is helpful. It states that among the functions and responsibilities of a Director of Citizens Affairs and Civil Rights are the following:

Secretary's (NR & CD) representative to citizens; EEO/AA officer (responsible for resolving all claims of discrimination brought against department); resolution of grievances brought to final level of departmental grievance procedure; sign-off authority on all departmental person-

nel selection and dismissal processes; Personnel Relations Officer.

Investigation Report, p. 2.

Plaintiffs argue that this position does not require a particular political affiliation, and further contend "[t]here is no reason why a Republican would be better qualified than a Democrat to listen to complaints, to refer them to the correct Division, and to make sure the complaint is resolved." Plaintiffs' argument is faulty in several respects. First, it fails to address the rather broad powers inherent in Sebo's position regarding the development and implementation of a departmental Affirmative Action Plan. It further fails to address Sebo's role as a representative for the Department, as well as his substantial public contact. Finally, this argument reads too broadly the protection provided by *Branti.*

The description of Sebo's position suggests a position which entails a substantial exercise of discretion in terms of the development of an Affirmative Action Plan, how it will be implemented, and how grievances will ultimately be resolved. More importantly, in handling citizen complaints and as the "Secretary's [liaison] to the citizens" of the state this employee is in an extremely sensitive position where he can greatly influence the public image of not only the department but the Governor's administration as well.

The court is persuaded that this is the "type of discretion that can be used to thwart the partisan goals of the incumbent administration," and as such the occupant of the position is "subject to dismissal on the basis of political affiliation." *Gannon v. Daley,* 561 F.Supp. 1377, 1383 (N.D.Ill. 1983).

### Roger J. Shackleford

Class member Shackleford was employed as a Planning Coordinator and Operational Manager in the contract management section of the NRCD. Rhodes argues that this position is not entitled to *Branti* protection. Once again, however, Rhodes has failed to provide any evidentiary support for his argument. Indeed, Rhodes' memorandum simply provides an illustration of a position that involves technical and administrative skills. His argument is largely a vague discussion of Shackleford's duties with respect to his staff. Rhodes does state that Shackleford's "section must execute and manage contracts totalling $20 million that provide services to approximately 14,000 participants," but he never states exactly what Shackleford's role is in "see[ing] that [these] funds ... are ... expended efficiently and comply with programatic and fiscal requirements." Ultimately Rhodes offers the court the following:

> This job clearly qualifies as an exempt position due to the ability and confidence required in this position and it is one that can be surely terminated at the will of the Secretary.

The court has found no such clarity in attempting to evaluate this position under *Branti.* According to Shackleford he was "responsible for the execution and management of all contracts and related matters between the Division and program operators accross [sic] the state. [He] also was responsible for the monitoring and assessment of Job training programs...." Interrogatory Response No. 11.

While these responsibilities could be interpreted as purely administrative, the court is persuaded that there is insufficient information to adequately conduct the *Branti* inquiry. Thus, summary judgment on the issue is not appropriate.

### Brenda Stephenson

Class member Stephenson was employed as an Administrative Secretary V with the Division of Employment and Training.[26] Rhodes contends that Stephenson was separated from employment as a result of a "reduction-in-force," that she was reassigned and "still works with the department, [and] to [his] knowledge ... never took a cut in ... salary, although the grade of her position was reduced when the classification was done." Rhodes has submitted a copy of the correspondence Stephenson received advising her of the reduc-

---

**26.** This position was designated "non-exempt" as of May 1985.

tion-in-force. He provides no further evidence to support his argument.

Stephenson alleges that political affiliation played a role in who would be upgraded and who was downgraded or dismissed during this "reduction-in-force." *See* Stephenson's Interrogatory Response No. 3.

The court concludes that there are genuine issues of material fact as to the reason for the adverse action taken against Stephenson such that summary judgment is inappropriate. A *Delong* inquiry remains.

Rhodes does not contend that Stephenson occupied a position for which political affiliation is an appropriate requirement.

### Samuel Thomasson, III

Class member Thomasson was employed as Deputy Director of the Division of Parks and Recreation. Rhodes argues that Thomasson was asked to resign because "[i]t was felt that Mr. Thomasson did not have the leadership potential to carry out the work that the new administration wanted done in the state parks program." Rhodes contends that the "parks division was generally in a shambles." Rhodes has failed to provide any evidentiary support for the argument that Thomasson was discharged for reasons unrelated to political affiliation or activities. Plaintiffs have, however, submitted evidence to support their argument that Thomasson was discharged because of the change of administration and for political reasons. The court concludes that there are genuine issues of fact with respect to the reasons for Thomasson's separation from employment. Accordingly, summary judgment, on this ground, will be denied.

Rhodes does not contend that the position is not entitled to *Branti* protection.

### William H. Towe

█ Class member Towe was employed as a Research and Information Supervisor in the Division of Economic Opportunity. Rhodes argues that Towe held a position that is not within *Branti* protection and has submitted a job description in support of this argument. According to that job description Towe

serve[d] as the chief advisor on all matters related to planning, developing, and evaluation of programs administered by the Division, including the Community Services Block Grant Program; ... supervise[d] the development and maintenance of the Division's management information system and operational policies and procedures; and ... plan[ned] and administer[ed] special programs of the division.

This position also entailed "conducting needs assessments, coordinating input from staff and grantees, staying abreast of applicable federal and state legislation and regulations, and preparing information needed for public hearings." Towe also stated in his job description that he was responsible for writing a new Administrative Code. Among his duties he stated that, with respect to the administration of special programs, he

[r]epresent[ed] the Director at meetings of the Department and at meetings and hearings of public and private agencies and organizations; ... [p]repare[d] information needed by the Director for speeches; ... [and] respond[ed] directly, or for the Director, to inquiries from other state agencies and the public. Some of the *responses* prepared for the Director are *related to policy matters*. (emphasis added).

The accuracy of this job description was attested to by Towe. Nevertheless, plaintiffs argue that Towe's position "required technical and professional expertise but that he did not have responsibility for the establishment of program goals or policies," and that Towe operated strictly within the policies and procedures established by statute and by the Community Development Council. *See* Towe Deposition, pp. 33–34. A full review of Towe's job description and deposition testimony reveals a position which includes a meaningful spokesperson role and the opportunity for input into policy related matters.

While Towe's deposition testimony and job description are not entirely consistent, the court concludes that he occupied a position which demanded that he work closely

with the deputy director and director of the division; it further allowed him the opportunity to comment on new policies and legislation. *See* Towe Deposition, pp. 26–28. The court concludes that by virtue of the character of his working relationships, and input into decisionmaking, Towe occupied a position for which political affiliation is an appropriate requirement.

### William Anthony Webster

■ Class member Webster served as Superintendent of State Parks until he was terminated in April 1985. Rhodes argues that this position is one for which political affiliation is an appropriate requirement.[27] Rhodes offers several statements regarding the duties and responsibilities of the position in his memorandum without offering any evidentiary support, but plaintiffs have submitted a job description.

The primary purpose of this position "is to administer and supervise the field operations of the State Park System composed of 38 State Park areas." While the superintendent has considerable responsibilities regarding field operations, anything which could reasonably be argued as "touching on partisan concerns" is strictly guided by the Administrative Code, State Park Rules and Regulations, the State Personnel Policy Manual, the Fiscal Policies Manual, and other policy directives from high levels in the department.

A thorough review of this position does not reveal one for which political affiliation is an appropriate requirement. Summary judgment will be entered for plaintiffs.

### Maury Wolff

■ Class member Wolff was employed as an Assistant Director for Administration in the Division of Marine Fisheries.[28] Rhodes argues that Wolff occupied a position for which political affiliation is an appropriate requirement. Plaintiffs argue that Wolff's duties were largely ministerial and did not relate to matters of political concern. Rhodes has submitted a job description prepared by Wolff in May 1984 which states, in part:

The primary purpose of [this] job is to supervise all administrative functions for the Division of Marine Fisheries by planning, analyzing, managing, and monitoring budgetary requirements. To do so, [Wolff] supervise[d] the fiscal, personnel, procurement, physical plant, and inventory control operations of the Division of Marine Fisheries.

In a lengthy attachment to the job description, Wolff amplifies his duties considerably.

I ... administer a $5.3 million annual budget and 133 permanent employees....

I supervise all budget planning, analysis, and monitoring for the Division. I have full authority to implement transfers ... and authorize major disbursements under State and Department guidelines....

I am the chief custodian of Division finances and maintain a constant review of all Division fiscal activities....

I am Division liaison with State and Department personnel offices. I advise all supervisors with discipline problems and in turn assist and inform employees with grievance procedures and policies....

I also work on various searches for outside funding sources, identify outside funding sources, and develop grant proposals; assist in long and short range strategies and plans; maintain professional affiliation with Fisheries administrators through the country....

I prepare all Division planning for budget and procurement needs for the biennium and yearly operations.... Advance planning may vary from consideration of a two-month temporary technician, preparation of a biennial continuation budget request, or preparation of an expansion program based on a 6–year plan for a capital construction. Most planning is in the 2– to 6–year range....

**27.** Interestingly, Rhodes has not argued that class member Thomasson occupied a position for which political affiliation is an appropriate requirement. According to the job description Thomasson was Webster's superior.

**28.** According to Rhodes, Wolff currently occupies a non-exempt position within the Division.

I supervise section chiefs in preparing section budgets, and I prepare the administrative section's budget....

At various stages of the budgeting process, I may prepare presentation for the NRCD Budget Review Committee, the Marine Fisheries Commission, and/or Legislative Review groups. I may give these presentations or assist the Director with a presentation....

The Director and I review Division goals and accomplishments on a twice-yearly basis at a minimum. I prepare cost-benefit analyses for the Director and review the efficiency of all on-going programs with section chiefs.

....

I must be prepared to act for the Director or Assistant Director in their absences.

....

The results of my work directly affect 133 permanent employees.... This Division is a public service agency whose task is to monitor and manage a great public natural resource. It is my job to see that the financial, personnel, and physical plant components of the Division function at their highest efficiency.

Had Wolff been a lawyer, and familiar with *Branti*, he might well have added to the list "the position is one in which the Governor may properly require political loyalty." The court so holds.

### Michael W. Street

 Class member Street served as Marine Biologist Chief from 1978 to 1986.[29] Rhodes argues that Street does not properly belong in this class action since he suffered no "adverse action." Rhodes contends that early in 1986 the Marine Fisheries Division was reorganized, and as a result there was a "reallocation down of [Street's] position from marine biologist chief to Marine Fisheries research section chief." Street's salary was not reduced. In February 1988 Street's duties were changed again, and his position was "reallocated" down to a lower pay grade.

Even under the most liberal interpretation of *Delong*, the court is persuaded that Street has not suffered an injury sufficient to warrant application of *Branti* protection. The reallocation down to a position of "Marine Fisheries Research section chief" with no reduction in salary is clearly not the substantial equivalent of a dismissal.

Accordingly, class member Street will be dismissed from this action.

### Benjamin F. Carraway

 Class member Carraway was employed as an Audit Program Manager in the Division of Employment and Training. Rhodes argues that Carraway held a position for which political affiliation was an appropriate requirement and that he was discharged as a result of a reduction-in-force. Rhodes has submitted a copy of the letter sent to Carraway advising him of the reasons for the termination of his position, which states "[t]he creation of new Service Delivery Areas and the impact of the federal Gramm–Rudman–Hollings Act have made it necessary to undertake a reorganization and major staff reduction within the Division of Employment and Training." Rhodes has provided no further support for this argument. The court concludes that the facts are in dispute on this issue and that summary judgment on this ground is not appropriate.

Rhodes has failed to submit a job description, or any other materials which could support his argument that as an Audit Program Manager, Carraway occupied a position for which political affiliation is an appropriate requirement. Furthermore, a review of Rhodes' description within his memorandum does not reveal a position outside of *Branti* protection. According to Rhodes, as Audit Program Manager Carraway

was charged with the responsibility for [sic] assuring that the audit regulations of CETA [later JTPA] were complied with. He had the responsibility to submit to the United States Department of

---

**29.** In May 1985 this position was designated as "non-exempt." In June 1986 Street was re-

turned to exempt status.

Labor a list of contractors across the state and their expenditures of CETA [JTPA] funds by years. From this list the United States Department of Labor selected which ones were required to be audited....

Essentially, Rhodes describes a professional, technical position, and not one which involves policymaking or duties which otherwise touch on partisan concerns.

Plaintiffs have submitted a WPPR for Carraway dated 19 October 1984. According to the WPPR the "major functions/duties/responsibilities assigned to this position" include:

> Supervise and maintain audit program for CETA contractors and subcontractors ... [and] for statewide JTPA operations. Supervise and direct the Audit Resolution Unit which reviews audit reports ... [and] [s]upervise the Indirect Cost Negotiator for CETA and JTPA operations.

A review of the work plan itself further suggests that this position requires technical and administrative skills.

The court is persuaded that Carraway occupied a position for which political affiliation is not an appropriate requirement.

To summarize, the court concludes that as to the positions held by plaintiff Stott and class members J. Donald Chappell, Garland–Swink, Griffith, Hodge, Joyce, Lahuffman, Muzinich, Sebo, Towe and Wolff political affiliation was an appropriate requirement and Rhodes' motion for summary judgment against them will be allowed. Class member Street has not suffered an injury compensable under *Branti* and will be dismissed from this action. As to the positions held by class members Allred, Carraway, Cashion, Fry, McAddo and Webster, political affiliation was not an appropriate requirement and summary judgment will be entered to that effect. Further evidence must be presented before a *Branti* determination can be made with regard to the positions held by Cornell W. Chappell, Greene, Moore, Moses and Shackleford. Also remaining to be decided are motivational issues surrounding the action taken against Allen, Brown, Carraway, Cruze, Fry, Gold, Greene, Stephenson, and Thomasson. Further evidence must be presented before a *Delong* determination can be made with regard to class member Lassiter. Class member Banner is properly within this class action and summary judgment will be denied accordingly.

## F.

## DEPARTMENT OF REVENUE

### *Defendant Helen A. Powers*

Defendant Helen A. Powers is the Secretary and head of the Department of Revenue. N.C.Gen.Stat. § 143B–218 provides that:

> It shall be the duty of [this] Department to collect and account for the State's tax funds, to insure uniformity of administration of the tax laws and regulations, to conduct research on revenue matters, and to exercise general and specific supervision over the valuation and taxation of property throughout the state.

There are four class members who were employed with the Department of Revenue.

### *Joseph Grissom*

Class member Grissom was employed as the Personnel Director for the Department of Revenue. An evaluation of this position has proven one of the more troubling. As personnel director Grissom possessed a wide range of duties and responsibilities. He also had a considerable amount of influence with respect to the implementation of personnel policy.

The position of personnel director involves, *inter alia*, "the administration of all personnel program functions for the Department of Revenue." Defendants' Exhibits 1, 4; Grissom Deposition, p. 22. The director's duties include: (1) administering a classification and salary program; (2) administering a health benefits program; (3) the interpretation and application of personnel policies (in this role the director exercises a considerable amount of discretion in the interpretation of broad statewide policies and their subsequent application, *see* Defendants' Exhibit 1, p. 2.); (4) dealing with employee grievances and assuring compliance with established procedures (*see* Grissom Deposition, pp. 36–37);

(5) conducting a continual review of positions (Deposition, p. 22); (6) making recommendations of realignment or revision of duties (Deposition, p. 23); and (7) making final recommendations for employment of applicants (Deposition, p. 32). Among the director's daily activities were conferences with the Secretary, Deputy Secretary, division directors, attorneys, Governor's office representatives, and/or other employees of the Department of Revenue. Defendants' Exhibit 4, p. 1.

Grissom's position involves substantial responsibility, policy interpretation, and the exercise of considerable discretion.

A newly elected governor is besieged with applications for employment. In filling vacancies and newly created positions he is entitled to place people who, otherwise qualified, are friendly to his administration. To insure that this is done he is entitled to have the top personnel jobs staffed with someone of his own choice. It has been said that for every "appointment" to a public job there are several "disappointments." Those disappointments and the people who supported their application were also, presumably, supporters of the Governor and need to be treated kindly and with a great deal of diplomacy. The Governor is entitled to have someone politically compatible in this sensitive position to assure job patronage works to his advantage rather than his detriment.

Finally, it should be noted that state employees, as a group, are one of the largest potential voting blocks in the state. The interpretation of personnel policies and the administration of classification, salary, health and other benefit programs by those charged with that duty can have a great influence on the way in which the administration is perceived in the eyes of the affected employees.

Political affiliation is an appropriate requirement for this position.

### Keith Goodson

■ Class member Goodson was employed as Director of the Corporate Income and Franchise Division. This division is responsible for administering the tax laws relating to corporate income tax, franchise tax, savings and loan tax, freight power lines gross earnings tax, and for administering the Primary Forest Products Assessment Act.

Job Description, Tax Administrator II, Defendants' Exhibit 2. The job description also states that the occupant of this position:

> Provides, as authorized by the Deputy Secretary of Revenue, information to the General Assembly, appears before various legislative committees, and provides Legislative fiscal research information upon request.

> [R]epresents the division in public appearances, provides information by making formal oral presentations to professional accounting, legal and taxpayer groups. Talks with the news media as requested by the Department public disclosure officer.

Goodson's response to defendants' joint interrogatory No. 11 also concedes that "[c]onsiderable time was ... given to reviewing and critiquing legislative bills and proposals...." Goodson's affidavit elaborates further:

> I was ... responsible for being informed about pending legislation which related to my Division. I would review pending bills to determine whether they were workable. I did not review legislation in order to express an opinion or advise with respect to the underlying policy. If possible to determine, we would provide the Secretary and the Legislature with our opinion as to the revenue effect of particular bills.

Goodson Affidavit, p. 2.

Although plaintiffs contend that Goodson's legislative role was in a purely technical capacity, the court is not so convinced and holds that when all responsibilities are considered the position is one for which political affiliation is an appropriate requirement.

### Sam Watson

■ Class member Watson was employed as the Assistant Director of the Inheritance and Gift Tax Division. This position involves largely technical, account-

ing and auditing duties. Powers contends that this position was eliminated and, thus, Watson has no standing as a member of the class. This action was taken in 1985 following an Efficiency Study Commission recommendation. However, plaintiffs contend that Powers has "selectively" followed those recommendations and that the real reason for Watson's termination was his political affiliation. An issue thus remains making summary judgment on this ground inappropriate.

Although defendants contend that political affiliation is an appropriate requirement for the position, the court is not so persuaded. The job description discloses a position dealing with the technical application of the inheritance and gift taxes of the State of North Carolina, including auditing, consulting with taxpayers and lawyers and supervising other employees. Although the occupant of this position might do research for legislative proposals, that research is of a technical nature. Additionally, his public relations work was only with "Clerks of Superior Courts, ... attorneys, accountants, trust officers, and others with whom we have frequent contact in our daily work and then done only 'on occasion' while visiting with our field men in their particular area." Interrogatory Response No. 11.

The court is convinced that this position was not one for which political affiliation is an appropriate requirement.

### Amy Stroud

Class member Stroud was employed as an Administrative Assistant II within the Industrial Commission of the Department of Commerce.[30] She voluntarily transferred from the Department of Commerce to the Department of Revenue to another administrative assistant position,[31] and was subsequently discharged.

The job description for this position is not well defined. It provides, predictably, that the employees in this position assist in carrying out a program's activities by performing a variety of administrative functions. The description also states that:

> Employees in this class may be responsible for: (1) independently organizing and implementing the administrative support for a large, complex program; or (2) serving as a staff assistant in gathering, analyzing, editing and reporting information for various administrative programs and projects requiring more discretionary and evaluative judgments. Employees are responsible for interpreting and assisting in developing program policies and procedures. Work usually requires considerable organization and analytical responsibility.

Defendants contend that since Stroud's position involved monitoring compliance and assisting policymaking officials, and disseminating information to the public, that political affiliation was clearly an appropriate requirement for effective job performance. The court is wholly unconvinced. Stroud's duties were unmistakably administrative. Her assistance in providing information to policymakers did not rise to the level of someone assisting in the full implementation of policies.

Accordingly, the court concludes that an administrative assistant is not a position for which political affiliation is an appropriate requirement.

To summarize, the court concludes that as to the positions held by class members Goodson and Grissom political affiliation was an appropriate requirement and Powers' motion for summary judgment as to them will be allowed. As to the positions held by class members Stroud and Watson, political affiliation was not an appropriate requirement and summary judgment will be entered to that effect. A factual issue remains as to whether Watson's discharge was because of the elimination of the position.

---

**30.** According to plaintiffs' exhibit # 13 this position was made non-exempt by the Martin administration on 27 June 1985.

**31.** Defendants Pope and Haworth moved for summary judgment against this class member.

Since she was last employed with the Department of Revenue she is not properly considered in their motion. The court will, however, address the merits with respect to her position within the Department of Revenue.

## G.

### DEPARTMENT OF ADMINISTRATION

*Defendant James Lofton*

*Defendant Grace Rohrer*

Defendant Grace Rohrer is the former Secretary of the Department of Administration. She served from January 1985 to March 1987, at which time defendant James Lofton assumed the position.

N.C.Gen.Stat. § 143B–367 provides:

It shall be the duty of the Department of Administration to serve as a staff agency to the Governor and to provide for such ancillary services as the other departments of State government might need to insure efficient and effective operations.

There are five remaining class members who were employed in this department.

### John W. Lail

 Class member Lail was employed as the Director of the Office of Child Day Care Licensing. This office within the Department of Administration is apparently in charge of implementing the policies and procedures of the Child Day–Care Commission.[32] The Commission was created by N.C.Gen.Stat. §§ 110–85 *et seq.* According to N.C.Gen.Stat. § 110–88:

[t]he Commission shall have the following powers and duties:

(1) To develop policies and procedures for the issuance of a license to any day-care facility which meets all applicable standards established under this Article.

. . . .

(5) To make rules and develop policies for implementation of this Article, including procedures for application, approval, renewal and revocation of licenses.

Given the broad responsibilities of the Commission, the court is less than convinced that the Office of Child Day Care Licensing possesses the extensive powers alleged by the defendants. Nevertheless, the court has been presented with a job description which provides that the office is responsible for statewide implementation of statutorily established programs.

The memorandum submitted by defendants is loosely worded and offers vague conclusory statements. For example, defendants contend that Lail "initiated policies affecting child day care, programs to implement those policies, and then monitored compliance with policies and programs throughout the state." Lail served as Director of the Office of Child Day Care Licensing for approximately five and one-half years. Surely defendants could have offered some specific example of a policy he initiated which affected child day care in a meaningful way.

 In any event, defendants correctly point out that the *Branti* exception is not limited to those who make policy. Lail's position, as a spokesperson and policy implementer, may be sufficiently sensitive to warrant the conclusion that the position is one for which political affiliation is an appropriate requirement.

Plaintiffs have submitted the affidavit of Dr. Hope Williams, former chief assistant to the Secretary of the Department of Administration. This affidavit concedes that "Mr. Lail could make recommendations to the Commission," and that "Mr. Lail advised the Department and the Commission on day care issues and at the request of legislative committees addressed their concerns regarding day care." Williams Affidavit, p. 2. Furthermore, Lail admits that he "implemented policy established by the Department of Administration and the Child Day–Care Licensing Commission," and that he "[a]dvised the Department and the Commission of day care issues to enable them to make decisions," and that he "served as an adviser to the Legislative Study Commission and various legislative committees dealing with day care at their request." Response to Defendants' Joint Interrogatories No. 11.[33]

---

**32.** The court is somewhat unclear as to the statutory authority, or other directive, which established the office in which Lail was employed. According to N.C.Gen.Stat. §§ 110–90 *et seq.* the primary department involved in implementing the policies of the Commission is the Department of Human Resources. ·

**33.** It is disputed whether Lail had the authority to issue, deny, renew, or revoke licenses for child day care facilities in North Carolina. Accordingly, the court has not considered this responsibility in conducting its *Branti* inquiry.

Upon review of the job description and other materials submitted, including statements of Lail himself, the court concludes that Lail occupied a position for which political affiliation is an appropriate requirement.

### Pamela Kohl

Class member Kohl was employed as the Executive Director of the Governor's Youth Advocacy and Involvement Office. The job description for executive director includes the following duties: "[A]dvise the [G]overnor, Legislature and other governmental officials regarding children and youth issues[,] ... serve as liaison to state, national and local groups interested in children and youth issues[; and] ... coordinate public information efforts regarding children and youth issues." Additionally, defendants contend that Kohl supervised a staff which provided support to four advisory councils created by statute. Defendants further contend that:

> Kohl acknowledged in her deposition that she was directly involved in the drafting of position papers to be considered by the citizens councils with which she worked and that she exercised some influence over these councils (Kohl Deposition at 63, 85–86); that she served as a spokesperson for these councils before governmental groups (Kohl Deposition at 84–85); that she conferred with the Governor about youth issues ... and that she testified before the state legislature (Kohl Deposition at 26).

Not all of these contentions are completely accurate. First, Kohl was not exactly "directly involved in the drafting of position papers." The substance of her testimony more readily supports the idea that she performed highly administrative/secretarial tasks for these councils. She did, however, develop documentation, and she did admit that she had the *opportunity to comment* frequently and did *have some*

influence with certain councils sometimes. Kohl did not exactly testify before the legislature either. Early in the Martin administration she was asked to come and speak and discuss just what her office did. In all other respects defendants' contentions are correct.

Ultimately, plaintiffs go too far in discounting the importance of those who occupy positions responsible for the *implementation* of an administration's policies. *See Elrod v. Burns,* 427 U.S. at 368, 96 S.Ct. at 2687.

Upon review of the job description and all other evidentiary material submitted, the court concludes that Kohl occupied a position for which political affiliation is an appropriate requirement.

### Margaret Riddle and Miriam Dorsey

Class members Riddle and Dorsey were both employed as Policy Development Analysts at the time they were separated from employment with the state.[34] According to the defendants, the Office of Policy and Planning is in charge of (1) developing policy options for the Governor; and, (2) coordinating cabinet departments and the statewide efforts of federal, regional, and private entities. The defendants have submitted not one, but three job descriptions for these class members. Two are entitled "Senior Policy Development Analyst" and appear identical; one is entitled "Policy Adviser III." [35]

Policy development analysts have the following duties and responsibilities:

> (1) research continuing issues "and suggest new or revised government programming with respect to these issues;"
> (2) draft "short analyses of policy proposals made to the Governor and refer[ ] to the State Planning Office for review and comment;"
> (3) create policy planning documents;

---

**34.** Riddle was formerly the director of this office. She was demoted to analyst upon Martin's election, but, she does not challenge that action here.

**35.** This job description includes more "visible" duties and responsibilities, including public speaking and spokesperson roles, as well as

more substantial policy initiative responsibilities. The court will not, however, consider this description in the ultimate resolution of these claims. Neither class member has been identified as occupying that position, and the defendants have not sufficiently supported any connection between the two descriptions and positions.

(4) act as a "liaison with university faculty, institutes, and centers ... [and] [o]utline[ ] the implication of basic research for State policy [and] [t]ranslate[ ] the research product into policy recommendations for scrutiny by the Governor or key legislative leaders;"

(5) "[p]repare[ ] under the direction of the State Planning Officer, Governor's Policy Guidelines which will be used as an instrument of management control ...;"

(6) "[a]ttend[ ] conferences where governmental problems related to North Carolina are being discussed or debated and report[ ] significant contributions;"

(7) "[d]esign[ ] research projects for execution by outside consulting institutions and monitor[ ] research product projects ...;" and

(8) "[p]rovide[ ] an 'early warning' system intended to anticipate major public problems before they reach crisis proportions and ... identify those problems for the Governor."

This position obviously demands substantial professional skills. It also demands the exercise of independent judgment which may be particularly sensitive to government interests and partisan concerns. The research duties of a professional will presumably be nonpartisan. However, the drafting duties included in preparing a proposed guideline or substantial policy more clearly involve judgments which may be affected by the political affiliation and political beliefs of the analyst. Plaintiffs read far too narrowly and strictly the requirement of political affiliation for effective performance of a position. Perhaps more often than not, "political" positions are performed successfully by professionals regardless of their political beliefs. The reality of political governance, however, is that the presentation of policy proposals contains an inherently subjective component which a public employer may legitimately view as critical to a successful administration. Indeed, the court predicts that the private political beliefs and political affiliation of these analysts could and "would interfere with the discharge of [their] public duties." *Branti*, 445 U.S. at 517, 100 S.Ct. at 1294.

After reviewing the job descriptions and other materials submitted, the court is convinced that the position of policy development analyst is one for which political affiliation is an appropriate requirement. Accordingly, class members Riddle and Dorsey are not within the protection of *Branti*.

### *William D. Robbins*

█ Class member Robbins was employed as an Assistant Director of the Office of Veteran Affairs. While in this office his primary responsibilities involved his role as Executive Director of the Governor's Jobs for Veterans Committee. *See* N.C.Gen.Stat. § 143B–420. In that capacity Robbins was expected to, *inter alia*, prepare and deliver speeches, work closely with veterans' organizations, develop publicity, and represent the Governor at meetings and conferences. It is agreed by all parties that Robbins was not involved in the formation and development of policy, but that he did have a role in implementing it. The policy to be implemented was the Governor's push for veterans' preference in employment. In order to implement this policy, Robbins was required to:

[m]aintain continuing contact with all programs designed to assist the veteran in securing suitable employment, evaluate each program for effectiveness, and report findings and recommendations to the official charged with responsibility for the administration of the program.... Serve as the officer in North Carolina where both veterans and employers can obtain advice.... Deliver speeches ... to all groups interested in jobs for veterans.... Develop[ ] publicity to be used by the news media ... Prepar[e] speeches which encourage the hiring and retention of veterans ...; [and] [r]epresent[ ] the Governor at meetings and conferences.

Job Description, pp. 1–2.

Plaintiffs emphasize the administrative and informational aspects of Robbins' position and his lack of management responsibilities. They provide little else and fail to address the implications of the high profile

and constant public contact involved in this position.

Robbins' principal task was to implement an important policy of the Governor and he had frequent contact with the public. Even though that policy is extremely well-defined, and Robbins' tasks in implementing it were likewise well-defined, the court concludes that the position is one for which political affiliation is an appropriate requirement. In fact, Justice Stewart in *Branti* could very well have been referring to this position when he said,

> it is ... clear that the Governor of a State may appropriately believe that the official duties of various assistants who help him write his speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments.

*Branti*, 445 U.S. at 517–18, 100 S.Ct. at 1294–95. Few groups in our society are as well organized and as active as those composed of veterans. The Governor is entitled to have a person of his choice representing him before these groups.

To summarize, the court concludes that the positions held by each of these five class members are ones for which political affiliation is an appropriate requirement, and the motion by defendants for summary judgment as to them will be allowed. Further, since the court is also dismissing the conspiracy claim the action will be dismissed as to defendants Lofton and Rohrer.

## H.

## DEPARTMENT OF TRANSPORTATION

### Defendant James E. Harrington

North Carolina General Statute § 143B–346 provides, in part, that:

> The general purpose of the Department of Transportation is to provide for the necessary planning, construction, maintenance, and operation of an integrated statewide transportation system for the economical and safe transportation of people and goods as provided for by law....

There are sixteen class members who were or are employed in this department.

### Arthur Beaman

█ Class member Beaman was a career employee until he was discharged from his position as a Revenue Tax Auditor III, and as Director of the International Registration Plan (a reciprocal agreement between the United States and Canada involving the collection of license fees). Nothing in the material submitted indicates that Beaman had any responsibilities other than professional, administrative and technical ones. The court is persuaded that he did not occupy a position for which political affiliation is an appropriate requirement.

### Larry Brock

█ Class member Brock was employed as the General Services Sections Head, Business Officer I. In his interrogatory answers Brock succinctly stated his duties:

> [he] oversaw the cleaning and maintaining of DOT buildings and grounds, recommended, but did not decide, on renovations which might be needed and contracts which might be entered into, supervised the DOT print shop, stockroom and mail room ... [and] assisted in the preparation of budget requests....

Interrogatory Response No. 11. The plaintiffs characterize Brock's position as a "housekeeping one." The court agrees and is wholly unpersuaded that Brock occupied a position for which political affiliation is an appropriate requirement.

### Cindi Hamilton

█ Class member Hamilton was employed as an Information and Communication Specialist I until she resigned in November 1985.[36]

---

**36.** Hamilton's letter of resignation indicates a return to college as a reason for leaving; however, her interrogatory response indicates she did not voluntarily resign. Rather, following the change of administration, her duties were substantially decreased, she lost her office and was harassed by her supervisor. Accordingly, summary judgment is not appropriate on the grounds of voluntary resignation.

Harrington argues that in her capacity as Information and Communication Specialist Hamilton occupied a position for which political affiliation is an appropriate requirement. Harrington contends that Hamilton prepared and wrote resolutions for him and the Governor, and composed speeches, letters, rebuttals and news releases.

Hamilton's job evaluation questionnaire states that she was "in constant contact with other sections of DOT to obtain information for [her] work and [was] in contact with the media by answering inquiries on DOT issues and projects." And, even though plaintiffs emphasize the routine nature of some of Hamilton's duties, the court is persuaded that she did occupy a position for which political affiliation is an appropriate requirement.

### Samuel H. Jones, Jimmy Parham

■ Class members Jones and Parham were employed as District Engineers until they were involuntarily transferred. Defendant Harrington argues that Jones and Parham are not properly within the class because they occupied a position that was nonexempt at the time of the transfers. The court has rejected this argument. *See* discussion of *Banner*, supra.

Harrington also argues that this is a position for which political affiliation is an appropriate requirement. He contends that district engineers were in fact "the eyes, ears and spokesm[e]n of the DOT in [their] district." A district engineer has considerable responsibilities in his area which covers from one to six counties. The "average district is comprised of approximately 2,100 miles of State roads...." Among their duties are the following:

> Serves as liaison with the public on the district level by investigating and responding to sensitive inquiries and complaints from the general public, business and property owners, and special delegations or committees....
>
> Administers Outdoor Advertising Control, Junkyard Control, and Garbage Collection Containers Programs....

> Supervises surveys to determine the feasibility of the addition of subdivision[s] and other routes to the State system....
>
> Serves as liaison between DOT and other governmental jurisdictions including Boards of County Commissioners and Municipal Governing Boards. Meets with members of these Boards to discuss highway matters within their jurisdiction....
>
> Investigates and makes recommendations on ... the abandonment of ... highways.

Although Parham contends that he was not permitted to make policy, it is apparent that the occupant of this position has a tremendous amount of discretionary authority in matters that greatly influence the image of the administration in the eyes of the public, specifically roads, but to a lesser extent outdoor advertising and garbage collection. The competition is keen for establishing new roads and maintaining old ones. The opinion of the district engineer in establishing priorities carries great weight. His endorsement may very well insure the success of a request whereas his opposition may very well spell its doom. Most importantly, however, are his public relations responsibilities with local officials and the general public in his area. He has to explain to a town or county board of commissioners why their road request can't be approved when one for a neighboring town or county has been. Harrington is correct. District engineers are "the eyes, ears and spokesm[e]n" not only for DOT but, in a real sense, for the Governor and his administration.

The court is persuaded that the position of district engineer is one for which political affiliation is an appropriate requirement.

### Edwin C. Guy

■ Class member Guy was employed as the Highway Safety Programs Coordinator until he retired in May 1985.

Harrington argues that Guy occupied a position for which political affiliation is an appropriate requirement. "The Highway Safety Coordinator provides continuing technical input into the identification, documentation, and formulation of specific highway safety activities and measures...."

Job Description, p. 1. This position obviously carries a great deal of responsibility. The duties, however, are those of a professional, and the court is wholly unpersuaded that Guy's duties touched on the partisan concerns of Governor Martin's administration.

Political affiliation is not an appropriate requirement for the position of Highway Safety Programs Coordinator.

Harrington also contends that Guy voluntarily resigned, thus making him ineligible for inclusion in the class. Documentation submitted by the parties reveals that the facts surrounding Guy's retirement are seriously in dispute, making summary judgment, on this ground, inappropriate.

### James G. Wilson

■ Class member Wilson was employed as the Director of the License and Theft Enforcement Section of the Division of Motor Vehicles. Harrington argues that this position is one for which political affiliation is an appropriate requirement. The court agrees. Wilson's job description indicates that he was "responsible for planning and administering a statewide law enforcement program." This position demanded substantial involvement in the direction of investigations and law enforcement. In the course of his duties he also made

> recommendations for amendments to current laws or new laws to be considered for enactment. [He] also attend[ed] conferences with legislators, legislative committees ... and the Attorney General's Office to discuss proposals, problems or interpretations of the various laws, rules, regulations or policies governing the many functions of the Section.

While Wilson contends that the Commissioner of Motor Vehicles established policies and he just "carr[ied] them out or put them into effect," the court is persuaded that Wilson's duties extended well beyond nonpartisan law enforcement. As such, he occupied a position for which political affiliation is an appropriate requirement.

### Roger Parker

■ Class member Parker was employed as Assistant Director for the Li-

cense and Theft Enforcement Section until he retired in March 1985. Harrington argues that since Parker provided input into developing and maintaining a law enforcement program, had budgetary and personnel responsibilities, and held administrative hearings, he occupied a position for which political affiliation is an appropriate requirement. The handwritten document, purporting to be the job description for this position, is not particularly coherent. It would appear that the occupant of the position is required to hold administrative hearings with regard to dealer franchises and inspection matters. Additionally, he handles consumer complaints and deals with matters relating to auto theft.

The court is not persuaded that Parker occupied a position for which political affiliation is an appropriate requirement. He was in a professional position that required the interpretation and application of rules and regulations in accordance with the law.

### William R. Oats, Jr.

[93] Class member Oats was employed as Assistant Secretary for Civil Rights. Harrington contends that this position is not entitled to *Branti* protection. The court is inclined to agree. In his interrogatory response, Oats has indicated that he "functioned primarily as a staff person with expertise in the field of Civil Rights, *advising the Secretary on civil rights issues.*" Interrogatory Response No. 7. *See also* Response No. 11 (emphasis added). Oats has characterized his position as involving "public relations and trouble-shooting tasks." Indeed it may; however, the job description clearly provides that the Assistant Secretary for Civil Rights "[s]erves as special advisor to the Secretary in monitoring and providing input on *all* matters relating to civil rights for the DOT." These responsibilities are not characteristic of a simple "staff" position as plaintiffs argue. The responsibilities "include investigating civil rights matters, developing proposed solutions to problems in this area, and providing advice to the Secretary on what the department's position should be." The job description also provides that Oats act as a representative be-

fore the public and respond to questions concerning the department's policies and practices.

These duties indicate that political affiliation is an appropriate requirement for the position. *See also* discussion of class member Sebo, NRCD.

### Joseph Register

 Plaintiff Register was employed as Director of Collision Reports and General Services, Department of Motor Vehicles. A review of the job description for this position reveals one that is largely administrative. It requires technical skills and knowledge. Register's role in budget preparation was also limited to preparing statistical information to the Commissioner. The job description provides that "[t]his employee will continue to research and evaluate proposed changes in laws, rules and regulations for impact on the budget and operation of the Division of Motor Vehicles." The court concludes that this responsibility was as a *technical, professional* adviser, not as a policy one, and that Register did not occupy a position for which political affiliation is an appropriate requirement.

### Malcolm Parnell

 Class member Parnell was employed as Motor Vehicle Training Coordinator. This position is primarily responsible for coordinating in-service training for Department of Motor Vehicle employees with some crossover with other Department of Transportation employees. The position is an important one as the occupant must be familiar with state and federal laws, rules, and regulations, and court decisions interpreting them. Professional expertise, not political savvy, is required of the occupant. Upon full review of the job description the court is persuaded that this position is one for which political affiliation is not an appropriate requirement.

### Roger Pruett, Shirley Dark

 Class member Pruett was employed as the Director of Motor Vehicle Registration and class member Dark was employed as the Assistant Director until they were discharged in January 1985. The parties seriously dispute the duties of the respective positions with plaintiffs relying on the statements of Pruett and Dark and defendants relying on written job descriptions that are at least 25 years old! [37] From all of the materials presented, however, the court is able to glean enough information to determine that Pruett, as Director of Registration, was in charge of a large section having under him some 495 employees, but that his responsibilities dealt solely with licensing, titling and recording liens of motor vehicles. The section is the recordkeeper for motor vehicles. Pruett's duties were prescribed by statutes and regulations and he had little, if any, discretion in carrying them out. He was not a policymaker or spokesman for the administration, even though he prepared statistical information for presentation to the legislature. His position was not politically sensitive. Dark's position, being inferior to Pruett's, was even less so. Political affiliation is not an appropriate requirement for either position.

### Leslie Wall

 Class member Wall was employed as the Driver License Coordinator for the Department of Motor Vehicles. This position involved the training of new drivers license examiners, coordination of employee training, and oversight of compliance with the law regarding drivers licenses. The court concludes that this position is not one for which political affiliation is an appropriate requirement.

### Jane Strickland

 Class member Strickland was employed as an Administrative Secretary in this section. According to Strickland, in

---

**37.** Foy A. Ingram held Pruett's position at that time and Edward Scheidt was Commissioner of Motor Vehicles. Terry Sanford was Governor of the state. Since then there have been five different Governors of the state and, no doubt, at least an equal number of Commissioners of Motor Vehicles!

her position as an Administrative Secretary she

> perform[ed] a variety of clerical and administrative duties requiring an awareness of everything happening in the section.... One of the most important functions that [her] position entailed was to perform duties related to public contact with all governmental officials, the General Assembly members, ... the news media and the general public.... [Her] *discretion in confidential matters was completely relied upon* ...

Interrogatory Response No. 11. (emphasis added.) Plaintiffs' argument that Strickland was merely a clerical employee is unpersuasive given Strickland's own description of her position. The confidential nature of Strickland's position, as well as the close and substantial contact with policy-making officials make this position inappropriate for *Branti* protection. For these reasons, and those stated in the discussion of class member Christian, pp. 45–46, the court is persuaded that Strickland occupied a position for which political affiliation is an appropriate requirement.

### Thurman Whitaker

■ Class member Whitaker was employed as the Assistant Director of School Bus and Traffic Safety Section. Defendant Harrington has not moved for summary judgment as to this class member though he has submitted a job description. The court has, nevertheless, reviewed the description and concludes that the position is not one for which political affiliation is an appropriate requirement.

To summarize, the court concludes that as to the positions held by class members Hamilton, Jones, Oats, Parham, Strickland and Wilson political affiliation is an appropriate requirement, and Harrington's motion for summary judgment against those class members will be allowed. As to the positions held by class members Beaman, Brock, Dark, Guy, Parker, Parnell, Pruett, Wall and Whitaker, and plaintiff Register, political affiliation is not an appropriate requirement and summary judgment will be entered to that effect. There remains for determination the voluntariness of Guy's resignation.

### I.

### DEPARTMENT OF COMMERCE

#### *Defendant Howard H. Haworth*

#### *Defendant James T. Broyhill*

Defendant Howard H. Haworth served as Secretary for the Department of Commerce from January 1985 to January 1987, at which time Claude E. Pope assumed the position. Pope resigned on 10 February 1989 and was succeeded by defendant James T. Broyhill. Broyhill has been substituted for Pope as a party defendant. Fed.R.Civ.P. 25(d)(1).

> N.C.Gen.Stat. § 143B–429 provides that: It shall be the duty of the Department of Commerce to provide for and promote the implementation of the declared policy of the State of North Carolina as provided in G.S. 143B–428, to promote and assist in the total economic development of North Carolina in accord with such declared policy and to perform such other duties and functions as are conferred....

There are ten remaining class members in this department.

### Clinton Abernethy

■ Class member Abernethy was employed as an Assistant Secretary of Commerce. The job description characterizes the assistant as a "chief of staff" post. Primarily, someone in Abernethy's position assures that policy and/or specific decisions of the secretary or deputy secretary are carried out. Work assignments include technical and policy overview and a consultative advisory role in departmental policy decisions. According to the job description, the assistant secretary's work "involves contacts with all departmental divisions in a variety of specialized fields. Contacts external to the department frequently involved high level managers and government officials." Haworth has further alleged that Abernethy acted "as a legislative spokesman for the Department of Commerce on policy matters ... [and] that Mr. Abernethy served as the chief lobbyist on policy matters for the Department...." Haworth Response to Interrogatory No. 1.

Plaintiffs' response is simply that Abernethy did not make policy and that policies were set by the secretary. Abernethy contends that he "advise[d] the secretary on the management of virtually all programs within the Department of Commerce, [but that] policies with respect to the operation of these programs were set by the secretary." Abernethy Affidavit, pp. 3–4. Abernethy describes his duties as having

> both line and staff components. My major line responsibilities were to oversee the operation of the State Ports Authority, to oversee the Wanchee Seafood Industrial Park, to oversee the energy program and to *manage the preparation and presentation of the Department of Commerce's legislative requests and budget presentations to the General Assembly....*

Abernethy's Response to Defendants' Joint Interrogatory No. 11 (emphasis added).

Abernethy's position, by his own admission, involves acting as a key spokesperson for the department before the Legislature.

The court concludes that Abernethy's position, as Assistant Secretary of Commerce, is one for which political affiliation is an appropriate requirement for effective job performance.

### Juliette Boisvert (Hardin)

 Class member Boisvert managed a welcome center on I–95.[38] As such, Boisvert performed hostess, managerial, and public relation duties. She had substantial contact with chambers of commerce, et al., and the public. Defendants argue that as such she was involved in "official communication" with persons outside state government and therefore political affiliation was an appropriate requirement for effective job performance. Defendants' argument is meritless. Defendants would have this court superimpose a political affiliation requirement on receptionists, office secretaries, and all variety of state personnel who have public contact and whose presentation and behavior necessarily reflects

---

38. As of 1 May 1985 the position of welcome center manager was designated "nonexempt."

upon state government. The court declines any such invitation.

The position of welcome center manager is not one for which political affiliation is an appropriate requirement.

### Hubert Gunter

 Class member Gunter was Director of Pilot Operations and a Pilot III. This position involves what you would expect—flying. The argument with respect to this class member is not concerned with the duties and responsibilities inherent in the position; rather, defendants are concerned with eavesdropping. They argue that since Gunter was "responsible for providing airplane service to Governor Martin and other high ranking officials, [he was] in a position to overhear confidential conversations and decision-making conferences involving high ranking government officials," et al. Defendants' argument is that Gunter had substantial access to confidential information and that accordingly his position was one for which political affiliation was an appropriate requirement. However, they do not present sufficient evidence on this contention for summary disposition. Further evidence must be presented on the size of the aircraft, seating capacity, access to confidential information, etc., before a decision can be reached. The pilot of a large aircraft, whose cockpit is separated from the passenger cabin and who is not otherwise exposed to confidential information, is not in a position which would normally require political affiliation. However, the pilot of a small plane, constantly in contact with his passengers, may very well occupy a position in which the Governor can require complete confidentiality.

### Hunter Poole and William Tyson

 Class members Poole and Tyson were employed as Industrial Development Representatives, who solicit and encourage industries to relocate to North Carolina. The work demands "considerable knowl-

*See* Plaintiffs' Exhibit No. 13.

edge of all phases of the economic development process, the socio-economic characteristics of the state, and general knowledge of the legal and regulatory requirements of doing business in the State." Representatives "have frequent contacts with corporate management, public and community leadership, and occasionally with the media and [the] general public." The "[w]ork involves gathering and conveying facts, coordinating the work of others, influencing decisions, and participating in sensitive and confidential managerial level meetings." *See* Job Description. These positions involve few well-defined duties or guidelines, and their occupants can have a considerable impact upon North Carolina's industrial development program.

Tyson was an Industrial Development Representative I and Poole was an Industrial Development Representative III. The job descriptions define the work of the former as "base level" and that of the latter as "senior level." (An intermediate level, II, is described as "journeyman level.") Their job descriptions are basically, however, identical, with the higher level positions apparently dealing with the larger and more important businesses and industries.

The location of new industry is a sensitive and highly competitive matter. It is not infrequent that the competition for a given industry involves different areas *within the state* as well as those outside the state. Delicate negotiations can be involved which, if disclosed, could jeopardize the success of the effort. Coordination of efforts and resources is often required. As stated in the job description for Poole's position: "High level impact of some decisions requires involvement with the Director of Economic Development, the Departmental Secretary, and the Governor, but employee participates jointly in decisions and strategy sessions." The job description for both positions states that the "[w]ork involves gathering and conveying facts, coordinating the work of others, influencing decisions, and participating in sensitive and confidential managerial level meetings."

The methodology of industrial recruitment can and does vary with individual or political party philosophy. Whether to offer a prospective industry tax incentives, new roads or utilities, or other inducements and how to finance such inducements are illustrative.

One measure of the success or failure of the administration of a Governor is his success or failure in attracting new industry. In choosing, through his Secretary of Commerce, who will assist him in meeting with industrialists and trying to persuade them to locate in North Carolina, the Governor is entitled to people of his choice. Political affiliation is an appropriate requirement for the effective performance of an industrial development representative.

### William Lewis

■■■■ Class member Lewis was employed as an Information Systems Director in the Employment Security Commission. This position involves planning, administrative and supervisory duties of all data processing activities in a computer center. The only provision in the job description which could possibly be interpreted as impacting state government in a way relevant to partisan concerns is the duties Lewis had in "interpret[ing] and apply[ing] state policies and objectives across all data processing functions."

An information systems director appears to be a sophisticated office manager whose duties extend to offices throughout state government. The employee who operates as an information systems director is acting in a professional capacity, with relatively well-defined duties. There is nothing in the job description which can reasonably support the conclusion that political affiliation is an appropriate requirement for the effective performance of this position.

### Linda Cox

■■■■ Class member Cox was an Administrative Secretary V in the Board of Science and Technology.[39] According to the job description submitted by defendants:

**39.** As of 1 May 1985 this position was designat-　ed as "non-exempt." *See* Plaintiff's Exhibit 13.

Administrative Secretaries serve as personal assistants or office or departmental managers performing a variety of clerical and administrative duties requiring an awareness of virtually everything happening in an office or department. Characteristic of these positions is a coordinative and administrative role with lesser emphasis on secretarial and clerical tasks....

Defendants contend that "[b]y serving as secretary of the administrative head of a grants program, Ms. Cox was involved in work which contained room for 'political disagreement' [and] had 'access to confidential information' and held [a position] for which 'political affiliation' was an 'appropriate' requirement for effective job performance." The court agrees. Class member Christian (Department of Human Resources) and class member Strickland (Department of Transportation) occupied identical positions. What was stated there applies equally here. As an Administrative Secretary V class member Cox had continued access to confidential information, and worked closely with high ranking officials. As such she occupied a position for which political affiliation is an appropriate requirement.

### James E. Vann

Class member Vann is a former director of the Science and Technology Center, in which capacity he was "responsible for the management of the ... Center ... [which] provides information retrieval services for industries, businesses, and governments in the Southeast." In carrying out his duties, the director, according to the job description, must establish "yearly and longer range goals and objectives." In addition, it is his duty to "review organizational efficiency and *make* [ ] *major changes as necessary.*" (emphasis added.) The director manages some 32 employees and has the duty to "review[ ] receipts, needs for additional manpower, equipment, or supplies" and "justif[y] budget to higher level management."

Just how much technology is to be provided to promote industry and to whom it is to be provided are matters of political concern to a governor as they obviously impact the state's economy and ability to attract and retain industry. The director of the Center, who has broad discretion in carrying out his duties, is one from whom the governor may reasonably require political allegiance.

### Harold Wiggins

Class member Wiggins was employed as an Internal Auditing Manager for the Employment Security Commission. No job description has been provided for this position, but defendants rely on Wiggins' interrogatory responses. Wiggins described his position as involving the development and maintenance of: (1) an agency-wide security program; (2) security policy/procedure; (3) a security handbook; (4) internal controls and procedures; and, (5) physical security of facilities, equipment, etc. He also performed financial audits of agency funds; operational audits of agency activity/personnel; and was responsible for investigating "alleged or suspected fraud or misuse of public funds, facilities, or data by employees, or gross mismanagement." Defendants contend that these responsibilities "clearly implicate 'policymaking' concerns, [and] the possession of sensitive and 'confidential' information, and the communication of [this] information ... to the public." This argument is not supported by the record before the court.

The position of internal auditing manager is not one for which political affiliation is an appropriate requirement.

To summarize, the court concludes that as to the positions held by class members Abernethy, Cox, Poole, Tyson and Vann political affiliation is an appropriate requirement, and the motion by Haworth and Broyhill for summary judgment as to these class members will be allowed. As to the positions held by class members Boisvert (Hardin), Lewis and Wiggins, political affiliation is not an appropriate requirement and summary judgment will be entered to that effect. As to the remaining class member Gunter, evidence must be presented before the court can make its *Branti* decision.

## IV. CONSPIRACY CLAIM

Plaintiffs' complaint alleges that several of the defendants (and others not involved in this action) engaged in a conspiracy to effect adverse personnel actions against state employees based upon their political affiliation or activities in violation of their rights under the First Amendment. Defendants contend that plaintiffs do not have sufficient evidence to maintain this claim.

In order to establish a civil conspiracy claim, plaintiffs must show:

(1) an agreement between two or more persons;

(2) to participate in an unlawful act, or a lawful act in an unlawful manner;

(3) an injury caused by an unlawful overt act performed by one of the parties to the agreement;

(4) which overt act was done pursuant to and in furtherance of the common scheme.

*Halberstam v. Welch,* 705 F.2d 472, 477 (D.C.Cir.1983).

[108, 109] It is not disputed that the termination of an employee, solely because of political affiliation, is an unlawful act if that employee is protected by *Branti v. Finkel.* Since the court has concluded that the remaining class members may have been discharged for impermissible reasons and are protected by *Branti,* the plaintiffs have presented sufficient evidence on the second element. With regard to the third element, the loss of employment or severe reduction of pay and duties (constructive discharge) is an injury within the scope of a civil conspiracy. That these "injuries" were caused by some, but not all, of the actors does not defeat plaintiffs' claim. *See Halberstam,* 705 F.2d at 477 (all that is required is one overt act by one of the parties to the agreement). If plaintiffs have sufficient evidence to support the allegation that an agreement existed among the relevant defendants (first element) and that the subsequent acts were ultimately taken in furtherance of that agreement

(fourth element), then plaintiffs may present the claim at trial.

The defendants argue that plaintiffs do not have sufficient evidence to support the allegation that there was an understanding, or common plan, among the defendants. In a civil conspiracy action the element of agreement need only be shown by "[p]roof of a tacit, as opposed to explicit, understanding" among the defendants.[40] Moreover, it is

> recognize[d] that since in most cases the court will have to infer a conspiracy from indirect evidence, it must initially look to see if the alleged joint tortfeasors are pursuing the same goal ... and are in contact with one another.... The performance of different *acts* at different *times* in different *places* ... requires a more extensive set of inferences to link the actors together. But such inferences are still sustainable in the proper factual setting.... Mutually supportive activity by parties in contact with one another over a long period suggests a common plan. (emphasis in original) (citations omitted).

*Halberstam,* 705 F.2d at 481. "While it is not necessary to prove that each participant in a conspiracy know the exact parameters of the plan, they must at least share the general conspiratorial objective." *Fonda v. Gray,* 707 F.2d 435, 438 (9th Cir. 1983).

Plaintiffs' principal evidence in support of an agreement are the minutes from a cabinet meeting held on 4 February 1985.[41] During the meeting three key people are quoted at length on the issue of patronage: James Trotter, senior assistant and special counsel to the Governor, Russell Jackson (Jack) Hawke,[42] special assistant to the Governor, and Governor Martin. The minutes provide, in part, that:

> Mr. Trotter said he wanted to talk about patronage. The criticism coming to us is that we are not placing enough of our

---

**40.** The "agreement" element is not the essence of a civil conspiracy action, rather "the essence of civil conspiracy is damages." 16 Am.Jur.2d Conspiracy § 49, p. 267 (1979).

**41.** The court assumes that all of the original cabinet secretaries were in attendance at this meeting.

**42.** Governor Martin's campaign manager during the 1984 election.

people in key positions. We appreciate the need for continuity, but we also have a strong need to respond to the people who put the Governor in office.... He said he would like to come in and talk individually with Secretaries ... to work out a procedure whereby this can be implemented.

[Mr. Hawke was quoted as saying:] We should look at new hires.... Governor Martin said that his philosophy is that we will not fire rank in [sic] file employees just to make room.... Governor Martin said in those positions which require confidentiality, you can't risk having someone going out talking. We have an obligation to get control of the administration.... Governor Martin said ... our goal is not to replace all of them [the 1,500 to 1,800 exempt employees] but the key spots have to be filled by loyal supporters.

These statements do not support the existence of a conspiracy to effect wholesale adverse personnel actions based on improper criteria. Indeed, they do not disclose an agreement to do *anything* illegal. As previously noted, the Governor had every right to place people in key exempt positions to assist him in implementing his program and, equally important, convincing the populace that he was doing so. Fairly interpreted, the quoted section says nothing more than that the Governor intended to take control of state government by replacing those employees in positions for which political affiliation is an appropriate requirement. He explicitly said, as he did in his deposition,[43] that it was not his philosophy to fire "rank and file" employees. The statement that criticism was being received for "not placing enough of our people in key positions" is capable of more than one interpretation, one of which does not necessarily imply unlawful, or bad, conduct. First off, the Governor had a right to place his people in key positions, so long

as present occupants were not unlawfully fired to make room for them. Secondly, complaints such as this are commonplace. When a new governor takes office he always has more supporters wanting state jobs than there are jobs available.

The court has also reviewed the deposition testimony of Trotter and Hawke, as well as memoranda exchanged between cabinet secretaries and Trotter and between Trotter and the personnel committee, and has failed to find any real evidence of an agreement necessary to establish a conspiracy.

As earlier noted, during the transition from the Hunt to the Martin administration, a transition team and a personnel committee were established to assist in the change of power. The roles of Trotter and the personnel committee were critical during the early part of Governor Martin's 1984 term. Trotter has testified that during this time period he served as a "liason [sic] between the Personnel Committee and the Cabinet Secretaries." Trotter Deposition, p. 45. He testified that he met with the secretaries on a regular basis, either at group luncheons or individually scheduled appointments. *Id.; see also* Hawke Deposition, pp. 258–59. He viewed his role as including "a listening function and trying to bridge the gap between the Personnel Committee ... and the Cabinet Secretary ... in connection with the way things were being handled." Deposition at pp. 46–47.[44]

A review of the depositions submitted does not reveal a clearly defined relationship among the transition team (which included Trotter), the personnel committee and the cabinet secretaries. It is clear that the committee and the transition team had some influence on, and an important "supporting" role for, the new cabinet secretaries. Among the documents submitted is a memorandum directed to the personnel committee from Trotter,[45] dated 9 April

---

**43.** The deposition was taken in the courtroom with the undersigned presiding in order to accommodate the Governor and the parties by immediately ruling on objections.

**44.** The court interprets "things" to include the matching of applicants to jobs and other personnel matters.

**45.** During his deposition testimony Trotter testified that he was not sure whether this memorandum actually made it out of his office and into circulation. Deposition, pp. 62–63. The court, however, assumes that it did.

1985. The memorandum concerned the personnel committee's "mission," and provided in part:

1. Place "our people" in policy making positions in every department. By policy making positions is meant [sic] department secretaries, assistant secretaries, personnel officers, legislative liaisons, public information officers, division heads and regional officers.

 . . . .

3. Act as a personnel agency for the departments to promote the hiring of Martin supporters . . .

The dynamics of the relationship between the personnel committee and the cabinet secretaries also do not appear entirely consistent. At certain points it seems that the committee played an important role as a personnel "clearing-house"; at others, it seems that the cabinet secretaries were not inclined to work with the committee. For example, Trotter has testified that while the personnel committee did not have any "veto" power with respect to personnel actions taken by cabinet secretaries, they did have a strong advisory role. He offered the following example:

There could be a proposed hire and Wilma [Sherrill] could have had a person that she thought should be considered for that job and who she would know had not been considered for that job, and so the committee would disapprove, again, not in the sense of veto but in the sense of saying we disagree, and then I would go to the cabinet secretary and ask the cabinet secretary if the cabinet secretary would give consideration to that particular person.

Deposition, p. 50.

The cabinet meeting minutes from 14 November 1986 also provide insight into the role of the personnel committee:

Governor Martin said a refrain he heard several times from people in the field is complaints about the difficulty they have getting people considered for jobs in state government. . . . I have told them that the department secretaries handled the hiring and firing in their departments. They know to work through Wilma Sherrill. I have to insist that when she calls, treat it as a call from the Governor—get back to her—that is, your personnel department. She needs some response that you are considering the person. . . .

On the other hand, a document has been submitted which reflects a lesser role for the personnel committee—a handwritten undated memo to Hawke from the "Office of the Governor" which reads "disruptive to *tell* cabinet secretaries what they must do, even on *my* authority. Respect their offices and reputation, requires *greater patience and forebearance along with persistence.*" (emphasis in original); *see also* Trotter's testimony regarding cabinet secretaries who were not fond of Wilma Sherrill as one of the reasons he decided to assume the role of liaison. Trotter Deposition, pp. 45–46.

Plaintiffs contend that a cabinet secretary's attendance at the cabinet meeting of 4 February 1985 as well as continued consultation with the personnel committee, and others, indicates that each cabinet secretary assented to and became a part of the alleged conspiracy. The court disagrees. Even though scant innuendo may be gleaned from bits and pieces of the evidence presented, when reviewed in context, and in relation to all other evidence, what is disclosed is a group of high-level gubernatorial appointees seeking to carry out the Governor's command to take control in their areas of responsibility while at the same time trying to accommodate the persistent efforts of supporters of the Governor, represented by Wilma Sherrill and the personnel committee, to obtain jobs.

In summary, the court concludes that plaintiffs have failed to present sufficient evidence of an agreement. Defendant's motion for summary judgment on this claim will, therefore, be allowed.

## V. INJUNCTIVE RELIEF

Defendants Broyhill, Lofton and Flaherty have moved for summary judgment on the ground that plaintiffs are barred from obtaining any injunctive relief against them. They contend that under *Mayor of Philadelphia v. Education Equality League,* 415 U.S. 605, 94 S.Ct. 1323, 39

L.Ed.2d 630 (1974), plaintiffs may not obtain prospective injunctive relief without supplemental findings of fact indicating that they have continued, or will continue, the practices of their predecessors. *Mayor* involved a section 1983 action brought by plaintiffs who alleged that the mayor had violated their equal protection rights by denying them appointment to the city school board nominating panel. During the pendency of an appeal in the action, a new mayor, that is a new administration, assumed office. Under those circumstances the court held that "a supplemental finding of fact indicating that the new officer will continue the practices of his predecessor" must be made. 415 U.S. at 622, 94 S.Ct. at 1334; *see also American Civil Liberties Union of Mississippi v. Finch*, 638 F.2d 1336, 1345–46 (5th Cir.1981) (If the court can construe plaintiff's complaint as alleging that these successors are actually continuing the unconstitutional practices of their predecessors, the action will not be moot. "Even if the practices have presently ceased, the case will still not be moot unless the defendants can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.'" 638 F.2d at 1346, *citing United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)). Where the plaintiffs have "supplied factual allegations from which the continuation of the dispute is a reasonable inference" the court should freely imply the allegation that successor officials will continue the challenged practice. 638 F.2d at 1346, *quoting Ciudanos Unidos De San Juan v. Hidalgo Cty. Grand Jury Commissioners*, 622 F.2d 807, 822 (5th Cir.1980), *cert. denied*, 450 U.S. 964, 101 S.Ct. 1479, 67 L.Ed.2d 613 (1981).

 The court makes two observations. First, since there has not been a "change of administration" as understood in the above discussed cases, plaintiffs' burden should be substantially lower. Plaintiffs have adequately established a pattern which tends to show that there is a practice throughout the Martin administration to inappropriately make certain personnel changes based on political affiliation or activities. If these allegations are ultimately accepted by a jury, the plaintiffs will have proven that a policy, that must inevitably have a severe chilling effect on the political affiliation and activities of current and future employees, was in place in North Carolina state government. It is reasonable to assume that these defendants as successors to certain original defendants have continued this policy and will continue to do so until ordered otherwise.

 Secondly, the court notes that part of the ultimate relief sought by these class members is reinstatement. Since in some cases the original secretary, who had authority to effect the personnel changes and presumably would have the authority to reinstate these class members, is no longer in that position, the person currently occupying that office must, of necessity, comply with any reinstatement order.

The motion for summary judgment on this ground will be denied.

### QUALIFIED IMMUNITY

On 9 December 1987 the court entered an order which denied, *inter alia*, the then defendants' claim of qualified immunity. Those defendants again argue, and all defendants now argue, that they may not be held liable for monetary damages since they did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). This court held that "the First Amendment rights protected under *Elrod* [*supra*] and *Branti* [*supra*] were clearly established in 1984 such that a reasonable person would have known that adverse personnel actions based solely upon political affiliation where political affiliation is not necessary to the job, are prohibited."

Defendants contend that this court must undertake a job-by-job analysis of each class member to determine whether there has been a denial of a "clearly established right" and accordingly whether their qualified immunity should be upheld. The court recognizes that "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The

contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). The *Anderson* court went on to point out, however, that "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Id.*, *citing Mitchell v. Forsyth*, 472 U.S. 511, 535, n. 12, 105 S.Ct. 2806, 2820 n. 12, 86 L.Ed.2d 411 (1985); *contra Juarbe–Angueira v. Arias*, 831 F.2d 11, 13 (1st Cir.1987) (holding that officials are entitled to "qualified immunity unless, at the time of the dismissal, 'it was clearly established that employees in the *particular positions* at issue, in light of the responsibilities inherent in those positions, were [constitutionally] protected from patronage dismissal.' ") *quoting Mendez–Palou v. Rohena–Betancourt*, 813 F.2d 1255, 1259 (1st Cir. 1987) (emphasis in original).

The test is an objective one and demands a certain degree of particular review. In keeping with *Anderson* the question the court must address is whether a reasonable person, in defendants' positions, could have believed that the discharge of the plaintiffs and the class members, in light of clearly established law and the information defendants possessed in early 1985, was unlawful.

For reasons hereinafter stated, the court concludes that with respect to the following class members' claims the defendants are entitled to qualified immunity: Allen, Cook, Davis, Fry, Kramer, Noland, Parker, Sauls, Stephenson, Trivette, and Webster. As to all other class members the court is persuaded that the defendants are not entitled to the shield of qualified immunity. Where the court has concluded that there is insufficient information available to conduct a *Branti* inquiry, the court, likewise, concludes that an assessment of a claim of qualified immunity is not possible. With two exceptions, where a defendant has failed to contend that a particular class member occupied a position for which political affiliation is appropriate, the claim of qualified immunity is denied.

■■■ There are forty-four remaining class members which the court has held occupied positions for which political affiliation is not an appropriate requirement. Those class members occupied thirty-nine different positions. The fact that the court has reached these conclusions does not mean, however, that these positions were clearly protected under established law as of late 1984 and early 1985. Some of the conclusions were reached more easily than others. While there may have been no precedent clearly prohibiting some of the defendants' actions, certain positions are so obviously protected by *Branti*, and could not credibly be thought of as falling within *Branti's* narrow exception, that upholding claims of qualified immunity would not be appropriate. Those positions were occupied by class members Gabriel, Hooks, Watson, Carraway, Stroud, Beaman, Gamble and Brock, Guy, Parnell, Boisvert (Hardin), Wiggins, Whitaker, and Lewis who were employed as, respectively, an Accounting Manager III, an Administrative Officer I, Assistant Director of Inheritance and Gift Tax Division (Department of Revenue), an Audit Program Manager, an Administrative Assistant II, a Revenue Tax Auditor III, Business Officers I, Highway Safety Programs Coordinator, Motor Vehicle Training Coordinator, Welcome Center Manager, Internal Auditing Manager, Assistant Director of School Bus and Traffic Safety, and Information Systems Director. These positions were either purely administrative jobs, housekeeping positions, or professional and technical positions which obviously did not involve policy-making or other responsibilities that could possibly have touched on partisan concerns. The responsibilities of the other positions were so clearly prescribed by manuals or legislation, that the court is persuaded that a defendant could not reasonably believe that these were positions for which political affiliation was an appropriate requirement.

■■■ The court further notes that the positions of Director of Collision Reports and General Services, Director and Assistant Director of Motor Vehicle Registration, Driver License Coordinator, and Highway Safety Programs Coordinator were also

clearly protected under *Branti* as of early 1985. *See Crisp v. Bond*, 536 F.Supp. 137 (W.D.Mo.1982) (held protected Assistant Director of the Division of Motor Vehicles and Drivers Licensing and Assistant Bureau Manager of the Driver License Bureau, with citation to *Branti*, *Elrod*, and *Gibbons v. Bond*, 523 F.Supp. 843 (W.D. Mo.1981), *aff'd* 668 F.2d 967 (8th Cir.1982)).

▮ Several of the class members occupied positions involving correctional facilities, or juvenile detention centers. These positions, upon review of the job descriptions, involve relatively clear administrative, managerial, and professional responsibilities. While the court has not located any case law involving positions such as these, the court is persuaded that under a fair reading of *Branti*, the defendants should have known that these positions were protected.

▮ Two class members occupied positions involving the Emergency Management Division. A review of the job descriptions revealed that these positions are substantially administrative, professional and technical ones, though they involve the important responsibility of planning procedures to utilize during emergency situations. These positions are clearly guided by legislation, and a reasonable employer could not have believed that these positions fell within the *Branti* exception. Even the First Circuit, which has read the *Branti* exception broadly, has held a similar position protected. *See Romero Feliciano v. Torres Gaztambide*, 836 F.2d 1 (1st Cir. 1987) (upheld *Branti* protection of Director of the Office of Emergency, Security, and Civil Defense for the Department of Puerto Rican Housing).

▮ The court is persuaded that defendants' claims of qualified immunity should be upheld with respect to eleven class members. Class member Cook was employed as the Chief of the Adult Health Section for the Department of Human Resources. As such he had broad responsibilities with respect to health program and policy. Resolution under *Branti* was very difficult for the court. Accordingly, the court is persuaded that the law was not clearly established in 1985, nor is it now,

that this position was entitled to protection from patronage dismissal.

▮ Class member Kramer was employed within the Department of Human Resources as the Director of the State Health Planning and Development Agency. The job description for this position clearly states that the primary duties of the Director are administrative. The Director does, however, have substantial responsibility for an agency of state government. Class member Kramer, even as an administrator, had an important role in "organizing, directing, and coordinating the planning and development of a State Health Plan...." The court is persuaded that defendant Kirk could reasonably have believed that Kramer occupied a position not entitled to *Branti* protection. Accordingly, Kirk's claim of qualified immunity as to Kramer will be upheld.

▮ Class member Davis was employed as the Chief of Program Services Section, Division of Aging. While the court ultimately concluded that this class member's responsibilities were "essentially administrative, technical and professional," the job description was less than clear. Certain provisions could have been interpreted quite broadly and the court is persuaded that given both the information defendant Kirk possessed at that time, as well as the state of the law at that time, it was not unreasonable for him to have concluded this position was not protected by *Branti*. Accordingly, this claim of qualified immunity will be upheld as to this class member.

▮ Class member Fry was employed as a Departmental Purchasing Officer IV for the Department of Crime Control and Public Safety. In resolving the *Branti* inquiry the court noted that Fry's ultimate responsibility, as he saw it, was "efficient and economical acquisition, management, and disposition of goods and services." The court noted that this statement could be construed broadly but was not persuaded that he occupied a position for which political affiliation is an appropriate requirement. Whether that was clear in 1985, and with the information defendant

Rhodes possessed, is another matter. Accordingly, the court is persuaded that qualified immunity is appropriate.

■■■ Class member Noland was employed as Special Assistant to the Secretary of the Department of Corrections. He supervised investigations, had various budgetary duties, but ultimately his responsibilities were nondiscretionary, and the court concluded that his job entailed administrative and nonpolicymaking duties. Class member Noland was a member of the Secretary's staff and answered directly to the Assistant Secretary for programs and development. These facts may have led defendant Johnson to believe that class member Noland occupied a "sensitive and confidential position." As such, the court is not persuaded that Johnson's actions were objectively unreasonable. Accordingly, the claim of qualified immunity will be upheld as to this class member.

■■■ Class member Sauls occupied a position as a Branch Manager, Division of Adult Probation/Parole. His position involved substantial supervisory, management and administrative responsibilities, including planning, organizing, directing, and routine budgetary duties. He was also responsible for the work standards of his staff. While the court was ultimately persuaded that this is not a position for which political affiliation is an appropriate requirement, the court is persuaded that defendant Johnson's actions in light of the law available in early 1985, and the possible interpretations of these responsibilities, were not unreasonable.

■■■ Class member Webster was employed as the Superintendent of State Parks. His primary responsibilities included the administration and supervision of field operations of the State Park System. The court has already concluded that while this position involved substantial responsibility, policy directives were received outside his office, and his other actions were strictly guided. The court is persuaded, however, that a reading of the job description could reasonably have led defendant Rhodes to the conclusion that Webster occupied a position for which political affiliation is an appropriate requirement. The

court is further persuaded that under the law available in early 1985 it was not clearly established that class member Webster occupied a position protected by *Branti*. *See Shakman v. Democratic Organization of Cook County*, 722 F.2d 1307 (7th Cir.), *cert. denied sub nom, Lindsey v. Kelly*, 464 U.S. 916, 104 S.Ct. 279, 78 L.Ed.2d 258 (1983) (City Park Superintendent of Employment not protected, court persuaded that the Park Superintendent was a policymaker, had broad discretion, broad authority, and worked closely with high ranking city officials); *see also Ecker v. Cohalan*, 542 F.Supp. 896 (E.D.N.Y. 1982) (position of Chief Deputy Commissioner of Parks, Conservation and Recreation for the County, described by the court as high powered, high salaried with considerable power over personnel appointments—patronage power—and accordingly not entitled to *Branti* protection). The court is persuaded that defendant Rhodes' claim for qualified immunity should be upheld with respect to this class member.

■■■ Class member Parker was employed as Assistant Director for the License and Theft Enforcement Section of the Division of Motor Vehicles. While the court has concluded that this position is protected by *Branti*, the court has held that the *Director* of this section is not entitled to *Branti* protection. Obviously, the court has concluded that the assistant director was not as clearly and directly involved in the direction of investigations and law enforcement. Nevertheless, the court is persuaded that defendant Harrington could reasonably have believed that Parker's position was one for which political affiliation was an appropriate requirement. Accordingly, Harrington's claim of qualified immunity will be upheld as to this class member.

■■■ Class member Trivette was employed as a Special Assistant for Local Law Enforcement. While the court was ultimately persuaded that this position simply required specialized knowledge regarding crime prevention and technical assistance to law enforcement, his position could reasonably have been viewed as one for which

political affiliation is an appropriate requirement. As the court has noted, the subject matter of his position is obviously sensitive, important and of partisan concern. Additionally, his extensive involvement with the public and community watch programs could reasonably have led defendant Dean to conclude that Trivette's position was not protected. Accordingly, defendant Dean's claim of qualified immunity will be upheld as to this class member.

 Class members Allen and Stephenson (both from NRCD) held positions as Administrative Secretaries V. These same positions occupied by other class members have been found to be ones for which political affiliation is an appropriate requirement. While defendant Rhodes failed to move for summary judgment as to these class members on *Branti* grounds, he did join in the motion for qualified immunity. Accordingly, the court concludes that defendant Rhodes is entitled to qualified immunity as to these class members.

## CONCLUSION

In conclusion the court holds that summary judgment is appropriate on the *Branti* issue with regard to seventy-seven positions, forty of which are entitled to protection and thirty-seven of which are not. There remain ten positions on which additional materials must be presented before such a decision can be made. Additionally, as noted in the discussion of individual class members, there are several members who the defendants have not argued occupied positions for which political affiliation is an appropriate requirement for effective performance of their positions. A *Branti* inquiry may be necessary if the defendants assert that contention at trial.

Of those class members entitled to *Branti* protection, the shield of qualified immunity bars eleven of them from seeking damages against defendants Dean, Harrington, Johnson, Kirk, and Rhodes in their individual capacity.

It would appear that there are no class members whose discharge will require a *Pickering* determination. There are approximately twenty-six class members whose discharge will require a jury determination of cause either under the *Mount Healthy* standard or as to the voluntariness of retirement, etc. The court also notes that of the class members who are being dismissed from this action, there were alternative claims as to thirteen of them that would have required jury resolution under *Mount Healthy*.

Finally, if plaintiffs prevail on the class issue there will be damages issues with regard to the various defendants and the remaining class members within their respective departments.

It is, therefore, ORDERED:

1. That political affiliation is an appropriate requirement for the positions held by plaintiffs Stott and Cayton, and class members Abernethy, Albright, Atkinson, Barbour, Barnett, Chappell (J. Donald), Christian, Congleton, Corley, Cox, Dorsey, Edmonston, Fesmire, Garland–Swink, Goodson, Griffith, Grissom, Hamilton, Hicks, Hodge, Hunt, Jarvis, Jones, Joyce, Kohl, LaHuffman, Lail, Long, Luther, Matthews, McKay, McKinne, Muzinich, Oats, Parham, Poole, Riddle, Robbins, Ryon, Sawyer, Sebo, Stewart, Strickland, Taylor, Thompson, Towe, Tyson, Vann, Wheeler, Williams, Wilson, Wolff, and Yow, and, as to them, this action is dismissed.

2. That class member McQuillan is dismissed as not properly included in this class action.

3. That class member Street is dismissed under *Delong,* as he did not suffer an injury compensable under *Branti.*

4. That political affiliation is not an appropriate requirement for the positions held by plaintiff Register and class members Allred, Beaman, Boisvert (Hardin), Brock, Carraway, Cashion, Cook, Dark, Davis, Flemming, Forester, Fry, Gabriel, Gamble, Guy, Hampton, Hawley, Hilliard, Hooks, Hughes, Ivester, Kramer, Lewis, Marion, McAddo, Moulton, Noland, Pagett, Parker, Parnell, Partin, Pruett, Rose, Sauls, Stamey, Stroud, Styles, Trivette, Wall, Watson, Webster, Whitaker, and Wiggins.

5. That defendants Dean, Harrington, Johnson, Kirk, and Rhodes are entitled to qualified immunity with respect to the

claims of class members Allen, Cook, Davis, Fry, Kramer, Noland, Parker, Sauls, Stephenson, Trivette, and Webster.

6. That the conspiracy claim is dismissed.

7. That this action is dismissed as to defendants Lofton and Rohrer.

8. That the joint and individual motions of defendants for summary judgment are, in all other respects, denied.